## CENTRAL TRUST COMPANY *v.* KNEELAND.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF OHIO.

No. 137. Argued January 7, 1891. — Decided March 2, 1891.

When a railroad company is incorporated to construct a railroad between two cities named as its termini, a mortgage given by it which, as expressed, is upon its line of railroad constructed, or to be constructed, between the named termini, together with all the stations, depot grounds, engine-houses, machine-shops, buildings, erections in any way now or hereafter appertaining unto said described line of railroad, creates a lien upon its terminal facilities in those cities, and is not limited to so much of the road as is found between the city limits of those places.

When a railroad mortgage contains the "after-acquired property" clause, the mortgage is made thereby to cover not only property then owned by

the company and described in it, but also property coming within the words of description and subsequently acquired, whether by a legal title or by a full equitable title; and there are no equities here to set aside that rule.

THE case, as stated by the court, was as follows:

On the 17th of January, 1880, the Toledo, Delphos and Burlington Railroad Company, a corporation organized by the consolidation of several constituent companies, executed a mortgage to the Central Trust Company of New York, by which it conveyed the following property: ",All and singular the line of railroad of the said party of the first part, as the same now is or may hereafter be constructed between Toledo, Lucas County, Ohio, through the counties of Lucas, Wood, Henry, Putnam, Allen and Van Wert, in the State of Ohio, and the counties of Adams, Wells, Huntington, Wabash, Miami, Grant and Howard, in the State of Indiana, (and not including the branch line from Delphos, Allen County, Ohio; thence via Spencerville, Mendon and Mercer, and through the counties of Allen, Van Wert and Mercer, to Shanesville, Mercer County, Ohio,) being about one hundred and eighty miles in length, together with all and singular the rights of way, road-bed made or to be made, its track, laid or to be laid, between the terminal points aforesaid, together with all the stations, depot grounds, rails, fences, bridges, sidings, engine-houses, machine-shops, buildings, erections in any way now or hereafter appertaining unto said described line of railroad, together with all the engines, cars, machinery, supplies, tools and fixtures, now, and at any time hereafter held, owned or acquired by the said party of the first part, for use in connection with its line of railroad aforesaid, and all its depot grounds, yards, sidings, turnouts, sheds, machine-shops, leasehold rights and other terminal facilities now or hereafter owned by the said party of the first part, together with all and singular the powers and franchises thereto belonging, and the tolls, income and revenue to be levied and derived therefrom;" and also provided: "The said party of the first part expressly covenants and agrees that it will, on demand, from

time to time hereafter execute, acknowledge and deliver unto said party of the second part any and all such further and other conveyances and assignments as may be necessary and proper to fully convey to and vest in the party of the second part, or the trustee for the time being, all such future acquired depots, grounds, estates, equipments and property as it may hereafter from time to time purchase for use in and upon its said line of railroad and intended to be hereby conveyed."

On June 21, 1880, the same railroad company executed to the same trustee another mortgage, known as the "terminal trust mortgage." · The property thereby conveyed is thus described : " All and singular the line of railroad of the said party of the first part as the same now is or may hereafter be constructed, between the southeasterly end of Washington Street, in the city of Toledo, Lucas County, Ohio; thence northwesterly along Washington Street to the aforesaid canal lands in said city; thence southwesterly along said abandoned canal lands to Swan Creek in said city; thence over said Swan Creek and the Miami and Erie Canal and over and along Mill Street and Canal Avenue, in said city, to the westerly limit· thereof; and thence to the point where said railroad crosses the westerly limit of said city of Toledo; together with all and singular the franchises, rights of way, station grounds, shop grounds, side-track grounds and grounds of any and every kind, for whatever purpose bought, between the points aforesaid, viz., the southeasterly end of Washington Street, in the city of Toledo, State of Ohio, and the westerly limits of said city, and together with the road-bed made or to be made, and tracks and side-tracks laid and to be laid thereon, together with all stations, workhouses, engine-houses, shops, turn-tables, water-tanks, buildings, erections of every description and all facilities of any and every description appertaining to said road-bed, station grounds, shop grounds and lands of every kind and for every purpose lying between the points aforesaid owned or acquired by the said party of the first part, for the use in connection with the part of its line of railroad aforesaid, and all its said depot grounds, yards, sidings, turnouts, sheds, machine-shops, leasehold rights and other terminal facilities now and

here*in*after owned by the said party of the first part in connection with the said part of its railroad, together with all and singular the powers and franchises thereto belonging, and the tolls, income and revenue to be levied or derived therefrom."

On foreclosure proceedings, duly had, of the first mortgage, appellee became, in the interest of the bondholders, the purchaser. After confirmation of sale and passage of title, and during the pendency of a suit to foreclose the second mortgage referred to, this proceeding was commenced by the trustee in the latter mortgage and certain holders of bonds secured thereby, against Kneeland, the purchaser. The bill was practically one to quiet the title of those security holders to the terminals in Toledo. To this bill Kneeland filed an answer and cross-bill. In the latter he set up his title under the first mortgage and the sale, and prayed to have his title quieted to these terminals. Upon proofs and hearing, the Circuit Court rendered a decree in favor of Kneeland, quieting his title to all except a small strip of the right of way, thereby adjudging priority of lien to the first mortgage. This decree the appellants brought to this court for review.

*Mr. W. W. McFarland* for appellants.

What the description in the mortgage of January 17, 1880, actually covered is a matter of fact, to be ascertained by any relevant evidence. *People* v. *Storms,* 97 N. Y. 364. It is conclusively proved that at the date of the Kneeland or Main Line Mortgage, the Toledo, Delphos and Burlington Company neither owned nor possessed any of the property embraced in the complainant's Terminal Trust Mortgage, nor did that company or its promoters have in January, 1880, any intention of acquiring *that property.* The intention was to obtain some property in the City of Toledo, if possible, upon which a railroad into the city could be built and terminal facilities there be created. The company had been successfully excluded from the city, and the promoters were at that time contemplating a terminal trust mortgage as the only means of obtaining money for the acquisition of terminal

property. These considerations exclude the idea of any intention to include in the mortgage any other than the existing lines of railroad and such additions as might be made to them, and as matter of construction necessarily limit the language quoted to additions that might be made to those lines of road.

We are not concerned with the rules of law concerning accessions or fixtures. Of course anything acquired by mortgaged railroads under those rules will come under the mortgage. . The property in question was wholly separate and distinct from that described in the defendant's mortgage, and whatever title to it the mortgagor ever acquired was acquired long after the date of the mortgage. Now, a mortgagee claiming, by virtue of a provision in the mortgage, property so after acquired, must claim through the mortgagor, putting himself in his place and standing in his shoes. No person can ever obtain any pecuniary benefit from the act of another without adopting and confirming the whole act in form and substance with all its incidents. That part which may be considered advantageous cannot be affirmed and that which may be considered burdensome repudiated. "A mortgage intended to cover after-acquired property can only attach itself to such property in the condition in which it comes into the mortgagor's hands." *United States* v. *New Orleans Railroad,* 12 Wall. 262, 264. See also *Beall* v. *White,* 94 U. S. 382, 387; *Williamson* v. *New Jersey Southern Railroad,* 28 N. J. Eq. (1 Stewart) 277; *Fosdick* v. *Schall,* 99 U. S. 235.

It follows from the foregoing principle that the Terminal Trust mortgage of June 21, 1880, made by the Toledo, Delphos and Burlington Company, being a valid and binding instrument according to its tenor as between that company and the mortgagee, is likewise a valid and binding instrument according to its tenor against the defendant, who claims under that company through the mortgage of January 17th of the same year.

*Mr. Robert G. Ingersoll* and *Mr. Clarence Brown* for appellee.

*Mr. John M. Butler,* filed a brief for appellee.

MR. JUSTICE BREWER delivered the opinion of the court.

The first mortgage had the " after-acquired property " clause in it. It is settled that such a clause is valid, and that thereby the mortgage covers not only property then owned by the railroad company, but becomes a lien upon all property subsequently acquired by it which comes within the description in the mortgage. *Pennock* v. *Coe*, 23 How. 117; *Dunham* v. *Cincinnati, Peru &c. Railway*, 1 Wall. 254; *Galveston Railroad* v. *Cowdrey*, 11 Wall. 459; *Thompson* v. *Valley Railroad Company*, 132 U. S. 68. And this is true, not only as to property to which it acquires the legal title, but also as to that to which it acquires only a full equitable title. *Toledo &c. Railroad Co.* v. *Hamilton*, 134 U. S. 296.

Where a company is incorporated to construct a railroad between two cities named as its termini, a mortgage given by it which, as expressed, is upon its line of railroad constructed or to be constructed between the named termini, together with all the stations, depot grounds, engine-houses, machine-shops, buildings, erections in any way now or hereafter appertaining unto said described line of railroad, creates a lien upon its terminal facilities in those cities, and is not limited to so much of the road as is found between the city limits of those places. The stations, depot grounds, etc., in the terminal cities appertain to the railroad as fully as similar structures in places intermediate those termini. In the absence of restrictive words, such is the natural import, and therefore must be adjudged the intent and scope of a mortgage containing that description. This first mortgage contains not only the general terms referred to, but after them, and as if it were to avoid any possible doubt, adds: " And all its depot grounds, yards, sidings, turnouts, sheds, machine-shops, leasehold rights, and other terminal facilities now or hereafter owned by the said party of the first part." It would be difficult to make language more full, accurate and descriptive. *Willink* v. *Morris Canal Co.*, 3 Green Ch. (4 N. J. Eq.) 377; *Morris & Essex Railroad* v. *Central Railroad Co.*, 31 N. J. Law, (2 Vroom,) 205; *Mohawk Bridge Co. v. Utica & Schenectady Railroad*, 6

Paige, 554; *Commonwealth* v. *Erie & Northeast Railroad*, 27 Penn. St. 339. There can be no doubt that by this mortgage a lien was created on the terminal facilities in the city of Toledo, and as this mortgage was executed some months before the terminal trust mortgage, apparently it created a prior lien. And if there were no other facts to be considered, the disposition of this case would be easy.

That the parties receiving bonds under this mortgage would understand that they were to have a first lien on .all terminal facilities in Toledo then owned or thereafter acquired, is clear. That the railroad company also understood that it owned and was giving a prior lien upon such terminals is evident from the fact that in the year 1879 it executed a mortgage for one million two hundred and four thousand dollars and negotiated six hundred and thirty thousand dollars of the bonds secured thereby, which bonds and mortgages were taken up and satisfied out of the proceeds of the mortgage of January 17, 1880, and in the prospectus, issued for the purpose of inviting investors to purchase those bonds, was this statement:

" *Terminal Advantages.*

"The Toledo, Delphos and Burlington Railroad has the right of way through and down the very centre of the city of Toledo. It enters the city near the Miami and Erie Canal, and substantially follows the canal to Washington Street; thence down Washington Street to Swan Creek and to Lake Navigation, within three squares of the post-office. This franchise is very valuable and of very great importance to the business of the road, and adds greatly to the pecuniary value of the property of. the corporation. No other road entering the city approaches so near to its centre ; none whose freight and passenger business is transacted so near to the business of the city. This franchise is considered valuable to the road not only from the fact that it affords unusual business facilities, but because it becomes independent of other corporations and renders its business secure without submitting to a heavy tax on its traffic."

Not only this, but when the mortgage of January 17, 1880,

was in contemplation, and on December 12, 1879, when its execution was ordered, the resolution of the directors declared: "That for the purpose of borrowing money for the use of the company to enable it to carry out the purposes for which it is organized and was consolidated, . . . and build, complete, equip, pay for right of way and depot grounds, and operate its railroad, it is expedient to prepare, issue and negotiate a series of first mortgage bonds, amounting in the aggregate to $1,250,000," and, "that in order to secure the payment of said issue of first mortgage bonds and the interest thereon, . . . the president shall also forthwith cause to be prepared a mortgage or deed of trust conveying . . . all this company's present and future-to-be-acquired line of railroad, appurtenances, and equipment and income thereof, between said city of Toledo in the State of Ohio and the town of Kokomo in the State of Indiana."

No one can misunderstand these declarations. They expressed to every purchaser of a bond secured by this first mortgage a purpose to vest in him a prior lien on all the property of the railroad company, including its terminal facilities — a lien superior to every incumbrance thereon. They unite, therefore, with the clear language of the mortgage the expressed intent of the mortgagor. To thwart this purpose, so obvious and expressed, there should be a clear disclosure of higher equity, and to the suggestions of that we pass.

The second, the terminal trust mortgage, was executed on June 21, 1880. On September 4, 1880, more than two months thereafter, the Toledo and Grand Rapids Railroad Company executed its mortgage to the Central Trust Company, to secure, not its own indebtedness, but the bonds secured by the terminal trust mortgage above referred to. This mortgage, in terms, conveyed the grantor's right of way within the city of Toledo, property which is, in fact, a part of the right of way and terminal facilities of the Toledo, Delphos and Burlington Railroad Company. On November 29, 1880, George W Ballou and wife executed a mortgage to the same Trust Company, conveying certain properties similarly situated and also as security for those terminal trust bonds. On April 12, 1881,

the Toledo and Grand Rapids Railroad Company conveyed to the Toledo, Delphos and Burlington Railroad Company all its properties. The consideration of such transfer was $265,-477.86 cash, an amount supposed to be sufficient, and provided to pay all the indebtedness of the Toledo and Grand Rapids Railroad Company. So far as the property standing in the name of Ballou is concerned, he was the financial agent of the mortgagor, the Toledo, Delphos and Burlington Railroad Company; and while he took the title to some properties in his own name, the purchase was with moneys of the mortgagor. Hence, while he held the legal title, the full equitable title was in the railroad company, and that property became, therefore, in equity subject to the lien of the first mortgage. Further, the mortgage from Ballou to the Central Trust Company, of date November 29, 1880, was really a tripartite agreement between Ballou, the Toledo, Delphos and Burlington Railroad Company, and the Central Trust Company, and recited that the mortgage to the Trust Company was in consideration of forty thousand of these terminal trust bonds received by Ballou. So, not only was this purchase by Ballou made with the funds of the Toledo, Delphos and Burlington Railroad Company, but he received also forty thousand dollars of the terminal trust bonds. Further than that, as we read the record — and there are seventy to eighty deeds and relinquishments of right of way contained in it — apparently the title to the bulk of the right of way passed directly to the Toledo, Delphos and Burlington Railroad Company, and not to Ballou nor to the Toledo and Grand Rapids Railroad Company, so that we have these facts before us: First, the title to the larger portion of the terminal facilities passed directly to the mortgagor, the Toledo, Delphos and Burlington Railroad Company. Second, all that part whose title was taken in the name of Ballou was paid for by the funds of the Toledo, Delphos and Burlington Railroad Company, and, therefore, it had the full equitable title, and he had only the naked legal title in trust for its benefit. Third, the incumbrance which he placed upon it in the tripartite agreement was not security for an independent lien, but simply additional security for the ter-

minal trust bonds issued by the Toledo, Delphos and Burlington Railroad Company. Fourth, the mortgage given by the Toledo and Grand Rapids Railroad Company, which was generally of its right of way and terminal facilities, was not to secure an independent debt, but the already issued terminal trust bonds of the Toledo, Delphos and Burlington Railroad Company. Fifth, all the indebtedness of the Toledo, and Grand Rapids Railroad Company was assumed and paid by the Toledo, Delphos and Burlington Railroad Company, as a consideration of the appropriation by the latter of all the franchises and property of the former. Whatever, therefore, may be said as to the scheme and plan of the parties who in the spring of 1880 were in control of the Toledo, Delphos and Burlington Railroad Company, the fact remains undisputed that its mortgage of January 17, 1880, covered, in terms, all subsequently acquired terminal facilities in the city of Toledo; that purchasers of bonds secured thereby were invited to invest, on the strength of representations by the company that it covered the terminal facilities; that the title to the larger portion of these terminal facilities passed directly and unencumbered by any one to the Toledo, Delphos and Burlington Railroad Company; that as to those portions whose title passed to Ballou and the Toledo and Grand Rapids Railroad Company, the purchase price was paid by the Toledo, Delphos and Burlington Railroad Company; and that the mortgages which they respectively executed to the Central Trust Company were not given to secure independent debts, but simply as collateral to the terminal trust bonds.

We do not question the proposition invoked by counsel for appellant, that a mortgage with an "after-acquired property" clause creates a lien upon property subsequently acquired only when it is acquired, and in the condition in which it is acquired, and subject to all existing liens; nor the other proposition, that the ownership by one corporation of the stock of another will not of itself prevent the creation of a new and independent lien upon the property of the latter, as adjudged in the case of *Williamson* v. *The New Jersey Southern Railroad Co.*, (28 N. J. Eq. 277; 29 N. J. Eq. 316). Yet we think those

propositions are not decisive of the case here presented. The mortgagor in the two mortgages of January and June, 1880, held the legal title to a large portion of the terminal facilities, and was the equitable owner of substantially the rest. Its first mortgage, its expressed purpose, was a lien upon those terminal facilities. No lien was ever placed by the holders of the legal title on that portion of the right of way and terminal facilities which did not stand in the name of the Toledo, Delphos and Burlington Railroad Company, to secure any new and independent obligation. These collateral and subsequent mortgages were in terms only to strengthen the security already given by the terminal trust mortgage. If they had never been executed, can there be a doubt that on a foreclosure the trustee in either the mortgage of January 17, 1880, or the terminal trust mortgage, could have subjected to its lien all property in fact a part of the right of way and terminal facilities, whether the title of the company thereto was either legal or equitable? They, therefore, only put into writing that which was already and in equity the obligations resting on the property. So, whatever may have been the secret thought and scheme of the parties controlling the management of these railroad companies, we are of opinion that the various properties included in the right of way and terminal facilities became in fact subjected to the lien of the two mortgages of January and June, 1880, executed by the Toledo, Delphos and Burlington Railroad Company. At least, that is true of all properties whose title passed to the Toledo, Delphos and Burlington Railroad Company. Certain properties whose title did not thus pass were by the decree exempted from the operation of this lien.

We think there was no error in the ruling of the Circuit Court, and its decree is

*Affirmed.*