Marshall, C. J.
Many of the assignments of error turn upon the proper construction of the clauses in the underlying mortgages conveying after-acquired property and upon the true interpretation of Section 9038, General Code, relating to the consolidation of railroads.
The underlying mortgages are in all respects quite similar in terms and conditions. The mortgage given by The Cincinnati & Hamilton Electric Street Railway Company covers all the lines of railroad then constructed or to be constructed in the counties of Butler and Hamilton and also “all exten■ *589 sions of said railroad so owned or operated by the party of tbe first part or which may be hereafter constructed, acquired or owned,” etc.
It was decided by the court of appeals that the plaintiff’s mortgage did not, by virtue of the provisions relating to after-acquired property, cover either the property of The Cincinnati & Northwestern Eailroad Company or a one-half mile extension constructed by The Southern Ohio Traction Company between North Bend road and the connection with The Cincinnati & Northwestern Eailroad Company. The most important question for determination relates to the property of The Cincinnati & Northwestern Eailroad Company, this property having been constructed by an independent company and joined to the property of The Southern Ohio Traction Company by the consolidation of March 22, 1902.
There is not entire harmony among the numerous authorities relating, to rights of mortgagees under clauses conveying after-acquired property, but it will be found that the .difficulty lies not so much in determining certain basic principles as in applying those principles to the facts of each individual case. Every foreclosure suit involving consolidated railroad systems naturally presents certain complications, but in these two consolidations the situation has become unusually complex.
In the state of Ohio, prior to 1852, there could be no valid incumbrance of after-acquired property, but in that year the legislature of Ohio enacted a law which is now Section 8794, General Code, reading in part as follows: “A railroad company may borrow money, at not exceeding seven per cent, per *590 annum interest for any purpose required in its business, execute bonds or promissory notes therefor in sums of not less than one hundred dollars, and secure payment thereof by a pledge of its property and income.”
In the ease of Coe v. Columbus, P. & I. Rd. Co., 10 Ohio St., 372, the legislative, purpose in passing that statute was declared to be to give more effectual security for the advance of money- to railroad companies, and, if power was required for such purpose, to pledge the franchise of the corporation connected with the road and the property which would necessarily be acquired in finishing and furnishing its road until the period for which credit was given should elapse. At page 393 of the opinion we find the following: ‘ ‘ The pledge is to be of the property and income. The income intended must have been the future income, and was to be produced by property in possession and to be acquired. If the future product can be conveyed, why not that by which it is created?”
The basic principles declared in that early case have been followed and amplified in many cases since decided by this court, but in no reported case decided by this court do we find that it has been determined that the after-acquired property clause will reach to a line of railroad constructed by an entirely independent company, complete in all respects, and in full operation, which has thereafter been consolidated with the mortgagor.
Many cases have been cited by counsel for the underlying mortgagees, holding that after-acquired property constructed even by a successor to the mortgagor will come within the terms of the mort *591 gage. Perhaps the strongest of these authorities is that of Wade v. Chicago, S. & St. L. Rd. Co., 149 U. S., 327. Without entering upon an elaborate discussion of the facts of that case it may be briefly stated that the senior mortgage in that case was given at a time when the road was only partly completed, but valuable franchises had been acquired for the completion of at least a part of the remainder of the line, and without such remainder being completed the portion which had already been completed would have been of little value, and the entire property was described and conveyed by the mortgage. In that case it would have been difficult to determine just what portion of the road would have been included if that portion which was completed by the successor had been excluded, and certainly the completed portion could not have been conveyed as a complete railroad enterprise. Much of the language which is found in the opinion in that case must be given application to the peculiar facts then before the court and cannot reasonably be extended in application to a completed enterprise constructed by another railroad company under a separate charter thereafter joined by consolidation.
A most pertinent authority is that of Harris v. Youngstown Bridge Co., 90 Fed. Rep., 322. It should be noted that this case was decided by Judges Taft, Lurton and Clark, two of whom have since rendered distinguished service upon the supreme court of the United States. In the opinion in that case there is a discussion of the theory of extending the lien of the mortgage to after-acquired property, and the distinction is drawn between cases in which mortgages are sought to be made to reach an exten *592 sion or addition to the mortgaged property, constructed or added by the mortgagor or its successors, and those cases where it is sought to have the mortgage reach a completed enterprise afterward acquired by purchase or consolidation. From pages 329 and 330 of the opinion we quote:
“It is said that most first mortgage bonds are issued in advance of the acquisition and improvement of the mortgaged property, with the understanding that the money paid for the bonds is to be used to buy and construct the subject-matter of the mortgage, and that this very useful plan will be entirely defeated, if the mortgagor may, by a device like that here used, create liens on the newly-acquired property prior in right to the original mortgage. Our conclusion would not validate any such proceeding as that supposed in the illustration. There is a clear distinction between the obligations of a mortgagor under a mortgage in which the property described as mortgaged, though definitely described, is yet to be bought and constructed, and the obligations of one under a mortgage in which the property described as mortgaged is in existence as a completed thing, and the after-acquired property clause is inserted only to increase the original security. In the former class of cases the mortgagor is impliedly bound to buy and complete the thing mortgaged as described, and bring it under the lien of the mortgage, without burden or incumbrance. * '* * In the latter class of cases the mortgagor is bound neither to make additions, nor, if he does make them, to free them from prior liens arising in and out of the act of acquisition. In the case at bar the bridge, as originally projected and contracted for, *593 with approaches and railway connections on both sides of the liver, had been completed, and the proceeds of the bonds issued under the first mortgage, and the capital stock had been honestly expended for this purpose.”
Applying those principles to the facts of the instant case, while it is true that the Cincinnati &, Northwestern railroad was not incumbered at the time of consolidation, yet a mortgage was immediately given which became a first lien upon that road and a second lien upon all of the remainder of that consolidated system, and it is therefore just as important to the purchasers at the sale under foreclosure of that mortgage as though the mortgage had existed prior to the time of consolidation.
It is urged by counsel for the divisional mortgages that the facts surrounding these transactions present strong equities in favor of extending the lien of their mortgages to the Cincinnati & Northwestern • division. We have carefully examined the record upon this feature and do not find equities sufficient to override the application of well-settled legal principles to this controversy.
This feature of the case might be disposed of upon the single authority of Harris v. Youngstown Bridge Co., supra, but there are certain other legal principles applicable which will be found necessary to be stated in disposing of other features of the case and may as well therefore be stated in connection with this feature.
Any new capital invested in the Cincinnati, Dayton & Toledo Traction Company, or money loaned to that company at the time of the consolidation agreement, had a right to look to unincumbered property *594 of that company as security for such investment or loan. It is urged that the construction of the line in 1898 to North Bend road was only a temporary stage in the construction of the road of the Cincinnati & Hamilton Electric Company, but inasmuch as a four-year recess intervened the temporary stage must be interpreted as a permanent pause in the construction of that mad, and the date of acquisition through consolidation with the Cincinnati & Northwestern Company cannot be held to be of that character contemplated by the mortgagee when taking a conveyance of after-acquired property. If the Cincinnati & Northwestern trackage had been constructed by the original mortgagor out of surplus earnings, or by the negotiation of additional loans, the extension of the mortgage thereto would have the sanction of sound principle, and it would seem on principle to'be equally sound if the completely built and equipped road had been purchased out of surplus earnings, but upon neither principle nor authority should the Cincinnati & Hamilton Electric Company be permitted to reap where it has not sown.
Counsel cite with confidence Compton v. Jesup, 68 Fed. Rep., 263, and it must be conceded that in the opinion in that case the court made utterances which went far beyond any principles necessary to a decision of that controversy, yet the spirit of that decision is that the after-acquired property clause will convey only, first, that which is described;, and, second, that which was intended to be conveyed.
We are also cited to the case of Central Trust Co. v. Kneeland, 138 U. S., 414. That was a controversy between claims arising under two successive mort *595 gages covering property of the T. D. & B. Rd. Co., each containing after-acquired property clauses. In that case the controversy turned more upon a question of fact than a question of law, because the court determined that at the time the first mortgage was given the company owned the rights of way and terminal facilities upon which the road was afterwards constructed, and the court therefore had no difficulty in determining that the first mortgage was a valid lien upon all those terminal properties in which the company had a valuable property right at the time the first mortgage was given.
We are more impressed with the reasoning in two rather recent cases. In Metropolitan Trust Co. v. Chicago & E. I. Rd. Co., 253 Fed. Rep., 868, we find the following: “Ordinarily the lien of a railroad mortgage having the usual after-acquired provisions does not, on the consolidation of the mortgagor corporation with another, spread to the property contributed by the other constituent, or to after-acquired property of the consolidated company.”.
While the foregoing was the expression of the court of appeals, the supreme court of the United States gave it at least tacit approval by denying a writ of certiorari.
In the opinion in that case the court cited the case of Compton v. Jesup, supra, as authority for the foregoing statement. In the case of Mississippi Valley Trust Co. v. Southern Trust Co., 261 Fed. Rep., 765, it was held that where one railroad company, after having given a mortgage covering after-acquired property, sells out its entire property to another corporation, the lien of such mortgage does not extend to property acquired by such successor *596 even though the word “successor” appears in connection with the after-acquired property clause in the mortgage. From page 767 of the opinion we quote: “The doctrine of accession is also invoked by the appellee. But the Monte Ne & Fayetteville lines were not added to the railroad belonging to the Oklahoma Company in the usual course of growth or extension. They were not acquired or built by that company, or for it, or with funds for which it obligated itself, or in which it was in any wise interested. They were the result of a new and enlarged enterprise of another railroad company directly dependent upon different financial engagements, an inseparable part of which was the lien to the appellant. Aside from any close consideration, the equities are clearly with those who furnished'the moneys for the Monte Ne and Fayetteville roads upon the express condition that they should have on them a first lien.”
It would be an endless task to discuss all of the pertinent cases which have been cited by counsel, and it is possible that great difficulty would be experienced in trying to reconcile all of the cases cited on both sides. The cases, however, will be found to be generally in harmony with the following proposition, to-wit: If a railroad company having charter rights to construct a railroad between certain termini actually completes the road a certain distance and owns the right of way or possesses a franchise covering additional distance, a mortgage given under such circumstances covering such property and franchises would operate effectively as a lien upon the structures thereafter completed upon such franchises. Abundant reason for this is found in *597 the fact that such franchises have a value, and, if the company, or its successors in title, whether by purchase or consolidation, commingles the value of such franchises with the value of the completed structures, with full knowledge of the after-acquired property clause in the mortgage, it will not be heard to complain. The same reason does not avail where the company has a mere valueless charter privilege which may be obtained by anyone at any time at small cost and upon mere application to the secretary of state.
In the voluminous briefs presented, there is a discussion of matters somewhat technical. It has been pointed out tt^t.the word “successors” does not appear in the- after-acquired property clauses in these mortgages, and it is therefore argued that the lien of the mortgages does not reach property acquired by the consolidated company and its lessees.
What the law might be if the successor were an ordinary purchaser of the property subject to the mortgage we have not considered and do not now decide. The instant case relates to a consolidation, and the provisions of Section 9038, G-eneral Code, are pertinent and decisive: “But rights of creditors, and liens upon the property of either company, shall be preserved unimpaired, and the respective companies deemed to be in existence to preserve them. Debts, liabilities, and duties of either company, thenceforth shall attach to the new company, and be enforced against it to the same extent as if such debts, liabilities, and duties had been contracted by it.”
Our conclusions also find support in Commercial Trust Co. v. Chattanooga Ry. & Light Co., 281 Fed. *598 Rep., 856, which case was decided by Judge Sanford, district judge of the Tennessee district.
In those portions of the mortgages where the word “successors” is not specifically employed in connection with the conveyance of after-acquired property, the statutory provisions will be read into the mortgage and the omission be supplied by necessary implication, and, in the absence of countervailing reasons, property acquired by a consolidated company in the course of fulfillment of the public purpose, and essential thereto, will be covered by such mortgage.
Further discussion is indulged concerning the failure in the divisional mortgages to stipulate for maintenance of the property in a state of efficiency. Here again the law imposes a duty which should be read into the contract. Many sections of the General Code of Ohio confer power upon the public utilities commission to compel such maintenance and the performance of other kindred duties to insure continued efficient service, and any interested member of society, including a mortgagee, may invoke the aid of the commission.
There is much discussion of a highly technical nature found in the reported cases, and also in the briefs of counsel in this case, concerning the particularity required in the description of after acquired property. The law governing after-acquired property clauses in railroad mortgages had a very modest origin in Ohio in a statute which made no specific mention of property to be acquired after execution, and it required judicial interpretation to. broaden and amplify the word “income” into the more embracive term “after-acquired property.” The early case of Coe v. Rd. Co., supra, involved *599 only a question of lien upon renewals and new purchases of equipment, and did not involve liens claimed upon extensions or property acquired by successors. It has been a far cry from that case to later eases which have construed after-acquired property clauses to include almost every conceivable addition, accession, and extension, whether acquired by the original mortgagor or by successors or consolidations, and in utter disregard of the rights of junior mortgages, creditors and the public. A prop-' er zeal to encourage and protect those who lend money to construct the road is commendable, but those who lend money to preserve and maintain the property as a going concern, and creditors who furnish current supplies for that purpose on short-term credit, without security, are also entitled to some consideration. While the first mortgage should receive all the security provided in the mortgage, the after-acquired property clause should be reasonably construed and applied, and not extended to ramifications of future acquisitions which could not have been in contemplation of the parties at the time of execution of the mortgage. There should be some reasonable relation between the purpose for which money is loaned and the fulfillment of that purpose. Where a charter and rights of way between certain fixed termini have been secured, and a mortgage given thereon, with proper description and after-acquired property clause, that mortgage should constitute a valid lien upon all the road between those termini, upon all equipment, and renewals thereof. But where the company has a mere charter, and only partial property franchises, and thereafter acquires by purchase and by means of *600 new capital, a completed property covering territory where it had no previous property franchises, though within the limits of its charter termini, or if such acquisition is by means of consolidation with another completely organized corporation, as in the case at bar, a very different situation is presented. We adhere to the principle declared in Harris v. Youngstown Bridge Co., supra, and hold that the divisional mortgages do not reach the completed property of the Cincinnati & Northwestern Railroad Company.
The Hale-Mile Extension at College Hill.
In the court of appeals this short extension was awarded to the Southern Ohio Traction mortgage. It is the claim of the divisional mortgagees that this property was within the charter termini of both the Cincinnati & Hamilton Electric Company and the Southern Ohio Traction Company, and that it was fairly understood to be within the description of those mortgages and therefore covered by the after-acquired property clauses. In the court of appeals the claim of the Cincinnati & Hamilton mortgage was denied because the description in the mortgage only described the road as far south as North Bend road. The mortgage, however, did refer to the charter termini and contained a very comprehensive after-acquired property clause. This extension was completed before the consolidation and with capital furnished by The Southern Ohio Traction Company. Whatever might be said of the long delay between the time the Cincinnati & Hamilton Electric Company completed its initial *601 construction and the time of the building of this half-mile extension, it seems to have been one of the things had in mind at the time of the first consolidation, and therefore in contemplation of the parties at the time of the execution of the Southern Ohio Traction Company mortgage. It is the judgment of this court that the one-half mile extension be included in the after-acquired property clause of the Cincinnati and Hamilton mortgage.
Trackage in the City oe Hamilton.
The trackage in dispute under this feature of the case is a few squares of track which have always been the property of the Hamilton city lines. At the time The Southern Ohio Traction Company purchased the Hamilton city lines, the interurban tracks of the Cincinnati & Hamilton Electric Company entered the city of Hamilton as far as the central portion of the city over its own separate tracks, but upon this consolidation the tracks of the Cincinnati & Hamilton were abandoned and the few squares of track in dispute were thereafter used jointly. This trackage was awarded by the court of appeals to the Hamilton city lines and we concur in that judgment. We find, however, that by reason of the consolidation, and the arrangement for joint use of the tracks, and the abandonment of other trackage on the faith of this new arrangement, the Cincinnati & Hamilton Electric Company acquired an equitable interest in the disputed trackage, and it may therefore be decreed that while the legal title shall rest in the Hamilton city company a joint operation shall forever be permitted upon the usual terms and conditions ap *602 plying to joint use of tracks, and that if the Cincinnati & Hamilton Electric desires to continue such joint use it shall as a condition thereto pay a proper proportion of the cost and expense of maintenance.
Lots and Lands Appurtenant .
During the operation by the lessees certain lots and lands were purchased lying parallel to rights of way for the purpose of removing railroads from highways and eliminating curves. In some instances entire tracts were purchased, when only parts were needed, because the whole could be purchased as cheaply as a part. These purchases were not pursuant to any express obligation on the part of the lessees, but were voluntarily made in the interest of better service, and the changes have not been perfected.
It is claimed that the court of appeals erred in denying the lien of the divisional mortgages in the unused lands appurtenant to those roads. Much that has already been stated relating to after-acquired property will apply to this proposition.
Accessions made to the property of that portion of the line between Dayton and Hamilton or between Hamilton and College Hill cannot accrue to the benefit and advantage of mortgagees of other portions of the consolidated system, and the mortgagee of that particular portion be wholly deprived of such additions.
If in the course of the conduct of the consolidated company by its lessees, it was deemed necessary to make certain improvements to the physical property of the constituent companies, and to make certain *603 purchases of real estate to more fully and effectually carry out their public functions as common carriers, and if funds were expended in so doing, some part of which was the commingled earnings of such constituent properties, the doctrine of accession may very properly be invoked to prevent a subsequent segregation and separate sale of such improvements and purchases free from mortgages given prior to such consolidation. All purchases of property to shorten the line, or to place the roadbed upon private ownership, where previously located in highways, must necessarily have been made upon the ground of public necessity and expediency and to subserve the purposes and functions of common carriers, since on no other theory could the lots and lands have been purchased, and it necessarily follows that if the purchases were necessary to the road they could not be separated therefrom and sold free from the mortgages which by their terms covered after-acquired property. The opinion of the court of appeals ordered some of these parcels to be sold free of the mortgage liens, on the ground that they were not necessary for railroad purposes, but the fact of their acquisition conclusively presumes their necessity and estops the consolidated company from controverting it.
It is no answer to this proposition to say that the successors and lessees of the mortgagors made the purchases voluntarily without having expressly obligated themselves so to do in the consolidation agreements and leases.
It is contended that title to some of the lots and lands was taken in the name of the consolidated companies and lessees, and that lessees do not be *604 come trustees for the use of the lessors and their predecessors. It is a complete answer to this to say that all authorities agree that after-acquired, property clauses attach to equitable interests quite as firmly as to legal interests. (Central Trust Co. v. Kneeland, 138 U. S., 414.) The accession of such lots and lands to the property of the mortgagor, and their inclusion in the mortgages, is not solely upon the theory of completing a contemplated line but also for the purpose of maintaining, improving and keeping step with modern methods of transportation.
It seems to be conceded that five city lots in Alexandria, and one lot in Miamisburg, have no relation to the public use, and those lots will not be included in the divisional mortgages, but all other lots and lands are subject to the mortgages upon the property to which they are contiguous or appurtenant, and such rights will include entire tracts so acquired in those oases where only a portion is immediately used or useful for railroad purposes but the remainder is adapted to and will probably become necessary for the future use of the company. Otherwise such portions of any tract or tracts so acquired not used or useful immediately, or in prospect, and which can be separated from the used or useful portion, will be held not to be included within the divisional mortgages. Those lands not used for railroad purposes, but being utilized for transmission lines, will be sold with the power plant. Hamlin v. European & North American Ry. Co., 72 Me., 91, and Hawkins et al., Trustees, v. Mercantile Trust & Deposit Co., 96 Ga., 580.
*605 Power House.
It is claimed that the trial court erred in awarding to the divisional mortgages only such portion of the plant as the value of the old power houses and feed lines bears to the value of the power plant to be sold herein. When the new power house was constructed there was a complete appropriation of the property in the power equipment of the various constituent companies to the use of the consolidated company, and to the same extent that that appropriation worked to the benefit of the consolidation it militated against the rights and securities of the underlying mortgagees, who had a right to look to such equipment not only for the value it represented, but also because it was one of the vital essentials of a complete electric railway system. There having been a complete appropriation at the time of consolidation, it is both legal and equitable to require a complete restoration at the time of dissolution of that union. At the time of consolidation the several constituent companies each owned a separate property, each was fully equipped with roadbed, cars, power and transmission, and therefore independently prepared to discharge the duties of a common carrier. Complete restoration to the constituent companies, or rather the mortgagees of those companies, upon dissolution of the consolidated company requires that each unit again have and possess the means of qperation in so far as in the power of the court to grant it. If the new central power plant had not been planned and built, it would have been necessary to extensively repair or rebuild one or *606 more of the individual plants, and it was a question of choice of means, to be determined by the consolidated ' company and its lessees in the exercise of sound business discretion. If the policy of continuing individual plants had been adopted, whether by repair or complete renewal, whether on ground belonging to the original mortgagors or on near-by ground to be acquired, there would be no controversy about the plants being subject to the mortgages, even though the cost and expense of renewal were equal to the cost of the new power plant. It is plain that power was needed, and that by reason of deterioration and obsolescence in the existing plants new power equipment had become imperative; and the consolidated company made its installation one of the conditions of the lease, and no limitations of business policy were imposed, but the lessee was free to carry out the covenant to “maintain, renew and replace all necessary power houses” in its own way. Any such improvement would be like any other permanent improvement of the property, and if at the option and in the discretion of the lessee a central plant became its declared policy such plant would become the common property of all in some proper ratio, and if erected upon land purchased by the lessee, instead of upon land already owned by one of the mortgagors or the consolidated company, a trust would necessarily attach to such land for the use of the various constituent companies.
The land having been purchased, and the central plant having been built, in fulfillment of the covenants of the lease, and having been used as a part of the essential equipment in the continued operation of the leased properties, it became part and par- *607 eel thereof under both the common-law and statutory duty of maintenance.
The mortgagees of the lessee took their mortgages with such knowledge as the record of the prior mortgages and the recorded lease would give, and cannot complain of want of notice.
Power and transmission are essential parts of the equipment of- any interurban railroad, and are no less essential than the rails, ties, trolley poles and wires, and are controlled by principles in no wise different, and.if the power equipment can be removed from the operation of the mortgage by building the renewals upon land purchased in the name of parties other than the mortgagor, the same thing could be accomplished in relation to the other essential parts of the property, above enumerated. In fact, the consolidated company and its lessees did make certain purchases of land for the purpose of removing portions of the roadbed to other locations, which purpose was a very proper one; but would it be claimed that the new roadbed would be the separate property of the lessee, and not subject to the .mortgage? Let us suppose that in carrying out the policy of straightening the right of way in places, and removing from highways to privately owned land, the entire road bed, station, buildings and equipment should eventually be located on land different from that described in the mortgages, which land should be taken in the name of the consolidated company or lessees, what would then be the rights of the mortgagees? This is of course a fantastic supposition, but it fairly tests the rules sought to be established; because, if any part of the property can be thus extracted from the original owner *608 ship, the entire property would be subject to the same processes; and, if all could not be, then no part could be. Phoenix Iron-Works Co. v. New York Security & Tr. Co., 83 Fed. Rep., 757.
Aside from the foregoing principles, there is the further contract obligation contained in the lease of May 1, 1905, to the Cincinnati Northern Traction Company, which provides: “And in the event of this lease being terminated through any fault or omission of the. lessee, all additions and improvements made by it upon the demised property, and all franchise rights and privileges, obtained by it as lessee hereunder appertaining to said demised property, together with the entire leased property shall be surrendered to the lessor without charge against or cost to said lessoi\”
It is urged that the power plant was designed bv the Ohio Electric Railway Company to be large enough to furnish power not only for the Cincinnati, Dayton & Toledo lines, but also for other lines then controlled and operated by the Ohio Electric. This claim is not established, because the power house was planned by the Cincinnati, Dayton & Toledo Traction Company in 1903, before the lease to the Cincinnati Northern Traction Company made in 1905,. and the lot was acquired by the Cincinnati. Northern and the franchise obtained in 1905 in the joint names of the Cincinnati, Dayton & Toledo and the Cincinnati Northern. The size and capacity of the power house must have been determined before the assignment of the lease to the Ohio Electric Company. The excess power must have been intended to take care of the larger needs of the lines then owned and operated. The power house was *609 therefore built to furnish power to the Cincinnati, Dayton & Toledo lines, with capital furnished by that company and its lessee, under a lease which contained a stipulation that it should be so done ; while located, on land owned by the lessee, access was by means of a franchise in the joint name of lessor and lessee; the lessee was not operating any other railroads, and was not authorized by its charter to operate as a power company. •
Manifestly the power plant cannot be sold with each of the divisional properties, and the court of appeals therefore decreed wisely in ordering it sold separately and the proceeds distributed among the divisional mortgages and the Cincinnati & Dayton Traction Company. This court is, however, not in accord with the court of appeals concerning the manner or the ratio of the distribution.
It is contended that the power plant was an independent enterprise, with capacity larger than the combined needs of the Cincinnati, Dayton & Toledo system, but it is clear that it was planned by that company and executed by its lessee under the agreement hereinbefore quoted, and distribution should be made to that company’s constituents. It is ,doubtful whether under the cogent provisions of Section 9038, General Code, such a stipulation in the lease gave any added force to the duties therein imposed, but it shows that the duty was recognized at the time, and the obligation made definite and specific. We have reached the conclusion that distribution should be made among all constituent railroads composing the Cincinnati, Dayton & Toledo system in proportion to' the power requirements of each respectively.
*610 It is further ordered that this cause be remanded to the court of appeals and that a special master be appointed to determine the present power requirements of each division; that said power plant be sold as a separate parcel subject to the lien of The Finance Company of Pennsylvania on an undivided interest therein, measured by the proportion which the present power requirements of the Dayton Traction Company-division bears to the power requirements of all divisions; that the proceeds of such sale be distributed (1) to plaintiff; (2) to The Cleveland Trust Company, Trustee under mortgage of The Southern Ohio Traction Company ; (3) Holders of Receiver’s certificates and The Cleveland Trust Company, Trustee under mortgage of The Hamilton & Lindenwald Electric Transit Company; (4) The Provident Savings & Trust Company, Trustee under mortgage of The Cincinnati & Dayton Traction Company, in the proportion which the present power requirements respectively of (1) The Cincinnati and Hamilton Division, (2) the Southern Ohio Division, exclusive of the Cincinnati and Hamilton Division, the Hamilton City Division and the Dayton Traction Division, (3) the Hamilton City Division and (4) the Cincinnati and Northwestern Division bear to the present power requirements of all divisions, exclusive of the Dayton Traction Division.
Transmission Lines.
In the court below the transmission lines were treat ed as a part of the power plant and it was decreed that even those portions of the lines erected on the right of way of the divisional properties *611 might be separated therefrom and sold with the power plant.
All that has been stated concerning the power plant applies in the abstract to the transmission lines. On the other hand, the erection of approximately two-thirds of the length of the lines on railroad property covered by the divisional mortgages raises new questions which challenge our serious attention.
It has been urged in argument that those portions of the transmission lines constructed upon railroad property become subject to the mortgage liens by virtue of the law of fixtures, but, after all, the law of fixtures is only another form of expression of the law of accession. It is noteworthy that all parties to this controversy, and likewise the courts below, have treated the new power plant and the transmission lines as subject in some measure to the liens of the underlying mortgages, though proceeding upon different theories. It is the theory of the underlying mortgages that the entire power equipment, including the transmission lines, became an accession to or substitution for property existing at the time of the execution of the mortgages, and therefore subject as an entirety to those liens, in due order of priority, and the proceeds thereof subject to distribution as between them upon some ratable and equitable basis. It is the theory of the junior mortgages that the power plant and transmission lines are separable from the remainder of the corpus of the property, though subject to the lien of the underlying mortgages according to the values of the old plants on July 1, 1905.
Legally, a separate purchaser of the power plant would not have the right to enter upon railroad *612 property and operate, the transmission lines, or remove them therefrom, if they have become legal accessions to the real estate and therefore fixtures. Approximately sixteen miles of parallel right of way was acquired for transmission lines, and these acquisitions were for railroad purposes in furtherance of the public service, and paid for out of the income of the lessees of the company under their obligation “to maintain, renew and replace all necessary power houses” and “to maintain and conserve said street railway entire.” Those lessees had the right to choose to acquire and utilize separate real estate for transmission purposes, but not having the right to deplete or destroy an integral part of the property, or to impair the service, any such acquisition by way of substitution for existing property necessarily became subject to the lien of mortgages; and the structures erected thereon for transmission purposes, if fixtures, were in every sense similar to the transmission structures on the other thirty-two miles of right of way, of which the mortgagors owned the legal title, and therefore not subject to operation or removal by a separate purchaser of the power plant. The court of appeals having decreed the separate sale of the power plant and all transmission lines, the application of 'the law of fixtures becomes a potent factor in the determination of this branch of the controversy. The question arises, what is a fixture? The underlying principle of the law of fixtures is that “whatever is annexed to the soil becomes a part thereof.” Although the decisions of the courts in different states are not free from confusion and uncertainty, the.above-quoted principle is firmly established in *613 Ohio, and while the rule is more often applied in controversies between landlord and tenant it also applies to annexations by a mortgagor after the execution of a mortgage, and certainly with much greater force where the mortgage contains a valid provision extending it to after-acquired property.
Without analysis of the numerous authorities which might be cited, it is sufficient to say that upon authority of Teaff v. Hewitt, 1 Ohio St., 511, 523, 524 and 530; Coe v. Columbus, P. & I. Rd. Co., 10 Ohio St., 372, 378; Coopers & Clark v. Wolf, 15 Ohio St., 523, and Harris v. Youngstowm Bridge Co., 90 Fed. Rep., 322, 332, 333, all transmission lines on railroad rights of way are fixtures, and where located on separate lands are fixtures upon appurtenant lands. The conclusion must therefore be reached that these several sections legally belong to the roads to which they are appurtenant.
It follows that the transmission lines north of the south line of Miamisburg are subject to the mortgage of The Dayton Traction Company, as a first lien, and should be sold with the section of railroad north of Miamisburg under the Southern Ohio mortgage, subject, however, to the first lien of the Dayton Traction Company mortgage; that the transmission lines from the south line of; Miamisburg to the power house in Hamilton are subject to the first lien of the Southern Ohio mortgage and should be sold with and as a part of the railroad held subject to such mortgage as a first lien; that the transmission lines between the power house and the north end of the right of way formerly owned by The Cincinnati & Northwestern Railway in Mt. Healthy, are subject to the first lien of the Cincinnati and Hamil *614 ton mortgage and should be sold with and as a part of the railroad held subject to such first lien; that the transmission lines and sub-station located on land formerly owned by The Cincinnati & Northwestern Bailway Company is subject to the mortgage by The Cincinnati & Dayton Traction Company on the former line ofi The Cincinnati & Northwestern Bailway Company as a first lien and is not subject to the mortgages by The Dayton Traction Company, The Southern Ohio Traction Company, or The Cincinnati & Hamilton Electric Street Bail-way Company.
Bolling Stock.
Surely it was one of the purposes, and, we think, the most laudable one, in providing that mortgages should cover after-acquired property, to preserve the integrity of the enterprise and the continuity of the service to be rendered to the public. It is important that all property whenever and wherever acquired, used and useful in the service, should become and always remain integral parts of the property. "if any interurban railroad executing a mortgage conveying after-acquired property is at the time of such execution the owner of'all the essential equipment of an interurban railroad, including right of way, rolling stock and power (which covers both generation and transmission), it is especially important that any accessions or substitutions should also be subject to such lien. It is settled beyond dispute that the power conferred by Section 8794, General Code, to mortgage the income, in-eludes and comprehends the power to mortgage the *615 property which produces the income, and as fast as parts of the equipment are worn out in the service the renewals thereof become subject to the lien without specific conveyance. This statutory provision would be denuded of meaning, and the principles declared in the former decisions of this court construing that section would be swept into the discard, if the underlying mortgagees should be denied priority in the substituted rolling stock, power plant, transmission lines and real estate.'
In this case we are not disturbed by any claims under conditional-sale contracts or liens in consideration of purchase price. In this case the mortgages conveyed all after-acquired property, and the mortgagors impliedly, though not expressly, covenanted to maintain and renew all property and equipment. ■ The consolidated companies which succeeded to the title of the property of the mortgagors, and all lessees thereof, expressly assumed certain obligations of those covenants, and by virtue of Section 9038, General Code, became obligated to carry out all the franchise obligations of the mortgagors and to give the public the service of transportation as a common carrier.'
These mortgages must be made effective in the light of the statute as construed by the former decisions of this court in Coe v. Columbus, P. & I. Rd. Co., 10 Ohio St., 372, 392, 393; Coopers & Clark v. Wolf, 15 Ohio St., 523; and Lane v. Baughman, 17 Ohio St., 642, and according to the broad principles of equity and public policy declared in many federal decisions. The Ohio statute and the state and federal decisions make such liens effective upon all movable and stationary parts of the system which are *616 essential to its operation, and to the changing and shifting property and equipment as it may exist during the period for -which credit is given.
When the Ohio Electric Railway Company surrendered its lease on July 1, 1918, the greater number of the ears then on the system were cars purchased by the lessee, and were at that time subject to car trust-liens, there being thirty-seven cars of all types substituted for cars on the lines at the time of consolidation. No adjustment was made between the Ohio Electric and The Cincinnati & Dayton Traction Company until December 24, 1919, at which time the Cincinnati & Dayton acquired such title to the substituted cars as the Ohio Electric could convey. It must be borne in mind that the second consolidation agreement obligated the Cincinnati, Dayton & Toledo Traction Company to renew womout rolling stock, and the same obligation was expressly assumed by the Cincinnati Northern Traction Company in its lease, and again by the Ohio Electric upon assignment to it of that lease. All cars acquired by the lessees became leased property, and on termination of the lease were subject to “be surrendered to the lessor without charge against or cost to said lessor.”
As in the case of the power-house lot, the Ohio Electric Company had no title to convey. The legal principles declared in the other features of this controversy apply to the rolling stock. The court of 'appeals held the cars subject to the divisional mortgages in the amount of the value of the cars at the time of the lease to the Cincinnati Northern Traction Company, but the judgment of this court is that the cars be equitably distributed among all the divi *617 sional roads of the Cincinnati, Dayton & Toledo system, having regard to type suitable to each division, if such distribution can be agreed upon, otherwise that all cars be sold singly in order to afford the fullest opportunity to each to acquire suitable types of cars and at the same time compel the greatest competition in the sale, and that such sale be made subject to car trust-liens and the proceeds divided among the divisional mortgages in proportion to mileage.
This method of distribution finds judicial sanction in the case of Louisville Trust Co. v. Cincinnati Inclined-Plane Ry. Co., 91 Fed. Rep., 699.
Depreciation Reserve and Distribution »e Earnings.
It is complained that the court of appeals erred in refusing to award to the divisional mortgagees the net earnings of the respective roads until after ‘ ‘default and demand” and in refusing to make proper orders for application of the accumulated net earnings to repairs and improvements.
A complete discharge by the consolidated company and its lessees of the statutory duties owing to the public and to mortgagees requires that the physical property be at all times maintained in such condition as to promote the convenience and welfare of the public and secure adequate service and facilities, and it is provided in Section 614-28, Greneral Code, that the public utilities commission may upon its own initiative make appropriate orders to that end. The Ohio statutes further recognize the fact that even though repairs and improvements are *618 kept up to all reasonable requirements there is still at all times a margin of depreciation which ordinary repairs do not cover, and this is cared for by the provisions of Section 614-49, General Code, which provides for an appropriation from earnings to a depreciation or deferred maintenance account, and that “the charge for depreciation shall be such as will provide the amount required over and above the cost and expense of maintenance to keep the property of the public utility in a state of efficiency corresponding to the progress of the art or industry.” The language of the statutes is in perfect harmony with the oft-declared policy of the courts to require adequate fulfillment of the duties which utilities owe to the public. This duty will not be discharged if on dissolution the several sections are unjustly dealt with in the distribution of the accumulated earnings City of Knoxville v. Knoxville Water Co., 212 U. S., 1, 13, 14.
The record indicates that a depreciation reserve has been maintained by The Cincinnati & Dayton Traction Company,, but we are not advised as to the amount of same, or whether such reserve is so classified as to show the amount credited to each class of equipment. If so classified, that amount credited to depreciation of power plant and transmission lines should be added to the proceeds of the sale of the plant and transmission lines and such aggregate sum be made available to the mortgagees, as hereinbefore provided. Other portions of the depreciation reserve should be distributed among the divisional mortgages according to the ratable measure of accrued depreciation of the properties covered by those mortgages respectively.
*619 Concerning that portion of the accumulated earnings which has not been set aside to a depreciation reserve flund, it is apparent from this record, and was so found by the court of appeals, that the physical property has not been maintained in a proper state of efficiency; neither has the public utilities commission ever made any order relative thereto. The pendency of the foreclosure and the administra - tion of the property by a receiver do not hold these duties in abeyance, and the mortgagees are therefore entitled to have such portion of the accumulated earnings expended for repairs and improvements as may be found necessary to put the physical property in a state of reasonable efficiency. It only remains, on this feature of the controversy, to determine whether the mortgagees are entitled to an apportionment of the net earnings among the several divisions, on the basis of their earning capacities, from the date of default in payment of interest, or whether this apportionment can only be made after a demand ma,de.
Upon this question numerous authorities have been cited and discussed by counsel for the Cincinnati & Dayton Traction Company, decided in other jurisdictions, and all of which seem to be quite uniform in holding that the earnings only belong to the mortgagees after possession taken. If those cases are controlling in Ohio they should be followed. On the other hand, if there is anything peculiar about the construction of after-acquired property clauses in Ohio, those authorities would not be controlling. In this controversy the mortgages cover the net income. It is so stated in the bonds and mortgages, and it is only upon the theory of mortgaging the in *620 come that the lien upon after-acquired property firmly attaches in this state. The Ohio statute makes no specific mention of after-acquired property, but does authorize the pledge of income, and the courts have held that the physical property then existing, and its renewals and additions acquired in preserving and maintaining the integrity of the enterprise and in fulfilling the public purpose set forth in its charter, are so necessary to the production of income that the authority to pledge the one necessarily implies authority for the pledge of the other. In the light of the statute and the decisions construing it no distinction is apparent between physical property and the income arising’ from the use of that property. This is the spirit of Coe v. Railroad, supra, and Lane v. Baughman, 17 Ohio St., 642. The income therefore belongs at all times to a mortgage covering after-acquired property, subject only to the restrictions and limitations contained in the mortgage itself. In these mortgages the net income prior to default was permitted to be used by the mortgagor, as appears in section 2 of the mortgage, and this provision carries the implication that it was the intent of the parties! that after default no such right should obtain. If this was the only provision in the mortgage it would seem that the contentions of the divisional mortgagees should prevail. An examination of article 3 of the mortgage, however, places a different light on the matter. That section provides that it is only after a default shall continue for the period of six months that the mortgagee may take possession of the property and collect and receive the income; and it is further provided in article 4 that foreclosure may not be begun until after six months default. It is the judgment of this court therefore that the mortgagees were only *621 entitled to receive the income after default had continued for the period of six months.
Income Paid to Mortgage Upon Hamilton City Lines.
The tenth assignment of error complains that the court of appeals ordered the sum of $6,250 paid to the trustee under the mortgage upon The Hamilton & Lindenwald Electric Company. It is claimed that the Hamilton city lines were operated at a large loss and that this sum, which was paid on December 1,1921, was paid after a net loss in the operation of those lines had accrued between January 1, 1921, and November 1, 1921, in the sum of approximately $43,000. Counsel for the Cincinnati & Dayton Traction Company have apparently made no effort to answer this contention, and we are wholly unable to see that that mortgagee would have any right to interest payments during the pendency of foreclosure proceedings, in the absence of earnings on that particular division covered by the mortgage, such payments being made out of profits earned on other lines. The order of the court of appeals on this feature of the case will therefore be reversed. This is the spirit of the case of Quincy, Missouri & Pacific Bd. Co. v. Humphreys, 145 U. S., 82, at page 92.
The final question submitted to this court is whether the trustees of the respective divisional mortgages have the right to recover judgment as such trustees against The Cincinnati, Dayton & Toledo Traction Company upon the bonds executed by the divisional mortgagors and for which The Cincinnati, Dayton & Toledo Traction Company became responsible upon consolidation, March 22, 1902. No questions as to the right to recover, or *622 the form of the pleadings, or the court in which judgment should be rendered, or whether with or without a jury, have been argued, but we are confronted with the sole question as to the right of the trustees to have judgment rendered in their favor. The bonds are almost exactly alike in terms and we therefore quote one of them, in part, as follows: “The Southern Ohio Traction Company * * * is indebted to The Cleveland Trust Company, of Cleveland, Ohio, * * * or bearer * * * in the sum of One Thousand Dollars ($1,000.00), which said The Southern Ohio Traction Company promises to pay to the said Trust Company, or bearer,” etc. It will be seen, therefore, that the trust company is named as payee of the bond and the bond is also payable to bearer. It is of course clearly understood that the trust company is a mere conduit and that the bonds are in nearly all instances held by other persons and owned by them. Nevertheless we cannot escape the fact that the bond is in the name of The Cleveland Trust Company, and if the contract was not for its benefit it necessarily follows that it must have been for the benefit of some other person. It is very clear therefore that in those cases where the bonds are in fact owned by other persons the trust company is not the real party in interest, and if Section 11241, General Code, was the only pertinent section this issue would have to be resolved in favor of the railroad company. There is however an exception to the provisions of Section 11241, and it is provided therein that such exception reaches to the next three succeeding sections. We therefore turn to 11244, General Code, where it is provided: “An executor, administrator, or guardian, a trustee of an express trust, a person with whom, or in whose name, a contract is made for the *623 benefit of another, * * * may bring an action without joining with him the person for whose benefit it is prosecuted.”
We have already seen that the contract is in the name of the trust company and that it is for the benefit of other persons who might purchase the bonds. Whether or not it can be said that this section was intended to meet just such a situation as we have before us in this controversy, it does seem that the section fairly covers the situation.
Manifestly it can make little difference to the debtor whether the action is brought by the trustee or by the holder and bearer of the bond. The debtor is only materially concerned with assurance of the finality of the judgment when rendered. This question therefore concerns the remedy rather than the right. It being a question dealing with procedure rather than substantial rights, where no harmful results can follow, the question should be settled without regard to technical niceties. It is urged, that, while the trustee in these mortgages is the trustee of an express trust, the trust instrument does not confer upon the trustee specific power to maintain an action for personal judgment, but that on the contrary specific power is thus conferred in the matter of foreclosure of the mortgage. We do not regard this as of controlling force, because the trust instrument would have been quite as complete without specific power being conferred in the matter of foreclosure. From the mere fact of conveyance to a trustee for the benefit of the bondholders it would necessarily be implied that the trustee might take appropriate action to secure the rights conferred by that conveyance. In matters of procedure every doubt should be resolved in favor of simplicity. To require separate proceedings at the suit of each in *624 dividual bondholder would cause a very large volume of proceedings and many difficulties of a complex nature. Suits might be brought in many different counties.' They might be begun at different terms of court. Questions of priorities would arise in levies of execution. Manifestly it is much better to have all claims determined in one action. This is by analogy to the well-known principle that equity will entertain jurisdiction of actions purely legal in nature to prevent a multiplicity of suits. If the specific authority had not been conferred in these particular bonds, and even if the statute did not in terms permit the action to be brought by a person or corporation in whose name a contract is made for the benefit of another, it would not be improper to imply from the language of this bond all necessary authority so to do.
"We have been referred to the case of Hays v. Galion Gas Light & Coal Co., 29 Ohio St., 330. But that case does not seem to be decisive, because the action was not brought by the trustee alone. In that case cross-petitions were filed in the suit by each bondholder, and judgment was rendered in favor of each individual bondholder upon his cross-petition. Counsel for the railroad company have cited and discussed several cases, among which is Mackay v. Randolph Macon Coal Co., 178 Fed. Rep., 881. In that ease a statute identical with Section 11244, General Code, was under construction. There is, however, a clear distinction between the bonds in that case and the bonds in the present controversy. In that case the bonds were not payable to the trustee, but payable only to bearer. It is apparent that that was the controlling feature in that case, as appears several times in the opinion.
*625 Surely nothing would be gained by requiring hundreds of bondholders to file voluminous cross-petitions when the allegations in each and all would be almost exactly identical. There is one suggestion in the Hays case which is worthy of emphasis. No money should be paid over to any bondholder by the trustee except upon surrender of the bonds, if paid in full, or except upon credit of the amount paid in the event partial payment only is made. This procedure is no doubt scrupulously followed in foreclosures where no personal judgment is rendered. If proper precautions are taken, and proper safeguards, to insure the finality of the judgment, we find no valid objection to personal judgment being rendered in favor of the trustees.
Inasmuch as this case was heard in the court of appeals only upon appeal it is proper to state that the court of appeals could only render judgment by virtue of its power and authority in chancery cases, and it could therefore render only a deficiency judgment. The petition in error filed in the court of appeals challenging the personal judgment rendered in the court of common pleas not having been disposed /of in the court of appeals, the same is not under review in the error proceedings in this court.
The judgment of the court of appeals will therefore be affirmed in part and reversed in part, and the cause remanded to that court for further proceedings in accordance with the views herein expressed.

Judgment affirmed in part and reversed in part, and cause remanded.

Hough, Wanamaker, Robinson, Jones and Matthias, JJ., concur.
Clark, J., took no part in the consideration or decision of the case.