## In re VICKSBURG BRIDGE & TERMINAL CO., Inc.

### Nos. 1236, 1237.

District Court, S. D. Mississippi, Vicksburg Division.

Oct. 18, 1937.

On the Issue of Solvency Nov. 18, 1937.

492

Watkins, Watkins & Eager, of Jackson, Miss., and Sholars & Gunby, of Monroe, La., for trustees.

Brunini & Hirsch, of Vicksburg, Miss., for stockholders.

Sidley, McPherson, Austin & Burgess, of Chicago, Ill., May & Byrd, of Jackson, Miss., Monroe & Lemann and Dufour, St. Paul, Levy & Miceli, all of New Orleans, La., Hudson, Potts, Bernstein & Snellings, all of Monroe, La., Green, Green & Jackson, G. Garland Lyell, and Flowers, Brown & Hester, of Jackson, Miss., Engle & Laub, of Natchez, Miss., David M. Proctor, of Kansas City, Mo., Coudert Bros., of New York City, Mayer, Meyer, Austrian & Platt, of Chicago, Ill., Wells, Wells & Lipscomb, of Jackson, Miss., C. T. Munholland and Oliver & Digby, all of Monroe, La., for creditors.

DAWKINS, District Judge.

In setting up its capital and financial structure originally, the debtor issued 60,-000 shares of no par value common stock, $5,000,000 of bonds, secured by first mortgage upon its property, and $2,000,000 of

debentures to be paid out of the net revenues after providing for interest and a sinking fund to take care of the bonds.

During the early history of the present proceeding, there were three committees formed for the representation of the security holders:

The first, the Protective Committee for Vicksburg Bridge & Terminal Company, Inc., First Mortgage 6 per cent. Sinking Fund Gold Bonds, of which John J. Shinners was made chairman (hereinafter referred to as the "Shinners Committee"); second, the Independent Bondholders' Committee for First Mortgage 6 per cent. Sinking Fund Gold Bonds of the Vicksburg Bridge & Terminal Company, Inc., of which Milton W. Harrison was chairman (hereinafter referred to as the "Harrison Committee"); and, third, the Independent Debenture Holders' Protective Committee of Kansas City, Mo., of which Charles L. Fontaine, Jr., was chairman (hereinafter referred to as the "Fontaine Committee").

On April 22, 1936, the Fontaine Committee filed herein a petition attacking the lien of the bonds under the mortgage for various reasons, and on January 20, 1937, amended this attack in opposition to the application of the trustees to distribute certain of the revenues derived from operations of the bridge to the bondholders; on the same day, Engle & Laub, attorneys of Natchez, Miss., claimants before the court for professional services rendered prior to the commencement of these proceedings, also filed opposition to the approval of the deposit agreement of the Shinners' Committee, setting forth additional grounds of invalidity of the lien of said bonds and mortgage; and at the same time certain stockholders, headed by Charles M. Brough, in answer to the rules of the trustees for distribution and to the application of the Shinners Committee for the approval of its deposit agreement, joined in and adopted the allegations of attack, both of the Fontaine Committee and Engle & Laub, upon the bonds.

On June 4, 1937, the Canal Bank & Trust Company, in liquidation, of New Orleans, La. (hereinafter referred to as the Canal Bank), and the Reconstruction Finance Corporation (hereinafter referred to as the R. F. C.), filed a petition for intervention, in which they adopted substantially all the allegations of the Fontaine Committee, Engle & Laub, and Brough and others with respect to the invalidity of the mortgage and lien of the bonds.

On June 16, 1937, the attack of the Fontaine Committee was withdrawn.

The present interveners, Canal Bank and the R. F. C., were allowed to adopt all the allegations of the previous attacks, including those of the Fontaine Committee, Engle & Laub, Brough and others, etc. They were all taken up and tried on June 16, 1937.

The grounds of the attack may be summarized as follows:

(1) The debtor was not a legal entity and could not, therefore, execute a valid mortgage or deed of trust and debenture agreement at the dates they were signed. (a) The election of directors on February 9, 1928, was void; (b) there was no legal directors' meeting to authorize the mortgage.

(2) The original purchasers of the bonds and debentures, H. M. Byllesby & Co. and Federal Securities Corporation, were, as a matter of fact, aware and legally chargeable with knowledge of the infirmities and invalidities of the proceedings under which the bonds and mortgage securing them were issued and executed and the present holders have no better rights than said purchasers.

(3) The property on which the easterly approach of the bridge rests is not covered by the mortgage.

(4) The franchise could not be mortgaged.

(5) That portion of the bridge in Louisiana could not be legally mortgaged. (a) Title to the bed of the river was in the State of Louisiana, which could not be alienated; (b) no authority or consent was obtained from the state to use its property; and (c) the mortgage does not comply with the law of Louisiana as to chattels or personalty.

(6) There being no title to the realty upon which the bridge rests in Louisiana, and hence no power to mortgage, the franchise and revenues could not be mortgaged effectively under an attempted encumbrance of real property.

The trustees under the bond mortgage and the committees representing the bondholders have put at issue all of the alleged invalidities as to the corporate entity and action, and, in the alternative, pleaded that it was a corporation de facto, if not de

jure, pleaded that they are holders in due course, in good faith, without knowledge of the alleged infirmities and invalidities, and that the interveners and others attacking the mortgage and lien of the bonds are estopped and precluded therefrom, both by express contract and equitable considerations.

The issues were tried upon the notes of evidence and records made up in other matters in this case, as well as additional evidence offered at the trial.

### As to the Corporate Entity.

I find the facts with regard to the organization of the debtor as follows:

Harry E. Bovay conceived the idea and undertook, as a promoter, to bring about the construction of a bridge over the Mississippi river at Vicksburg, Miss., as a link in national highway No. 80, which runs across Southern United States from coast to coast. He first organized a corporation under the laws of Arkansas, bearing practically the same name as the debtor, to which he succeeded in having granted by Congress a franchise or permit for the construction of the bridge. Armed with this authority, he set about to find capital for its exercise. After considerable negotiations, he reached an agreement with the officers and representatives of H. M. Byllesby & Co. and Federal Securities Corporation, investment bankers in Chicago, for the organization of another corporation under the laws of Delaware, to whom the franchise or permit should be conveyed, and for the sale of its securities to raise money to build the bridge.

The Corporation Trust Company of New York was employed to bring about the incorporation of the new company, and it prepared a charter, copy of which was filed in evidence. This charter authorized the issuance of 60,000 shares of no-par value common stock, and provided that the same might be issued from time to time for such considerations as the board of directors might determine. It provided that the corporation might begin business upon the issuance and payment for 10 shares, and the names and addresses of the subscribers thereto were given as follows:

A. L. Miller, Wilmington, Delaware, 8 shares
T. L. Fray, " " 1 share
Alfred Lewis, " " 1 share

Certified copy of certificate of incorporation was filed in the office of the re-corder of deeds for New Castle county, Del., on December 20, 1927, and on the same date there was paid to the secretary of state the sum of $215.50, in satisfaction of franchise and other taxes due upon the filing of the original certificate of incorporation.

On December 21, 1927, the incorporators above named assigned to John J. Shinners (chairman of the Shinners' Committee above mentioned) their subscriptions to the 10 shares of the company's stock. A board of directors, consisting of three members, were elected, and on the same date—December 21, 1927—it fixed the value of the stock at $5 per share, and adopted a set of by-laws. There is some uncertainty as to just when the funds for the 10 shares of stock of the original subscribers and for 190 additional shares to John J. Shinners were paid in. The attorney who handled the legal phases of the incorporation testified, however, that it was done before February 11, 1928, when the contract of lease with the Yazoo & Mississippi Valley Railroad Company for use of the railroad portion of the bridge to be constructed, was signed, although entry of this $1,000 on the books of the debtor was not made until April 3, 1928, Shinners, who was supposed to have made the payment, is not positive as to just when it was done, but my conclusion is that it was before the company had made any contracts or undertaken to exercise corporate functions. It was recognized by the office of the secretary of state of Delaware, which has charge of such matters, as a bona fide corporation from December 20, 1927, when the franchise taxes, etc., were paid, throughout the year 1928. The certificates for the 200 shares of common stock were actually issued to and received by Shinners on May 28, 1929.

On February 9, 1928, the three original directors, Edward G. Ince, Geo. R. Lee, and Richard J. Schupp, tendered their resignation at a meeting of the board held on that date, which were accepted to take effect on the following day, February 10th, and at the same time there were elected three new directors to take their places, as well as two additional members of the board. The by-laws adopted on the 21st of December preceding had fixed the number of directors at five and provided that, in event of a vacancy by death, resignation, or otherwise, those remaining should fill it.

There is some dispute as to whether a special meeting of stockholders was held

on April 3, 1928, as reflected by the minutes of the corporation. However, there is in evidence a waiver of notice of said meeting, signed by John J. Shinners, who was the only stockholder at that time, bearing the date of April 3, 1928, and there is also in the record a waiver of notice of a special meeting of the board of directors to be held on the same date, signed by the five persons who were named to constitute the new board, on February 9, 1928, including Mr. Harry E. Bovay, who denies that he was present at said meeting and has tendered proof from his own files of correspondence to show that he was in Memphis, Tenn., on April 3, 1928. I think the evidence preponderates substantially in favor of the meetings, both of the stockholders and directors, having been held on approximately the date mentioned. The waiver of notice signed by Shinners, the lone stockholder, states that the proposed meeting was to be held "for the purpose of authorizing the purchase from Harry E. Bovay of a franchise," previously granted by Congress to the Arkansas corporation, "to construct, maintain and operate a bridge across the Mississippi river at or near Vicksburg," and "authorizing the sale of all of the unissued stock of the company, of authorizing the execution and delivery of a first mortgage deed of trust of the company, and the issuance and sale of $5,000,000 par amount of first mortgage 6% sinking fund * * * bonds * * * secured by said first mortgage"; while the waiver signed by the five directors, including Bovay, recites the same purposes and, in addition, that the meeting of the directors was to authorize "the execution and delivery of a trust agreement of the company to the issuance and sale of $2,000,000 par amount of Twenty-year 7% sinking fund gold debentures, secured by said trust agreement, of authorizing the execution and delivery of a disbursement agreement between the company and the Continental Bank & Trust Company * * * covering the disbursement of money to be employed in the construction of the proposed bridge. * * *"

The minutes show that at the meeting of the stockholders, over which John J. Shinners, the sole stockholder up to that time, presided, adopted a resolution authorizing the borrowing of not to exceed $5,500,000 and the issuance of $5,000,000 of bonds bearing 6 per cent. interest in denominations of $500 and $1,000, all maturing March 1, 1948, and providing for their retirement and redemption according to the terms of said resolution; also authorizing the execution and delivery to secure said bonds in principal and interest a first mortgage or deed of trust conveying and mortgaging all of the real property of the company then owned or thereafter acquired by it, together with the said bridge and approaches thereto and that certain franchise acquired by assignment from the grantee, under the Act of Congress approved May 3, 1926, 44 Stat. 388, for the construction of the bridge at Vicksburg; and that the said mortgage or deed of trust should be recorded in the proper office of the county of Warren, state of Mississippi, and parish of Madison, La. Similar resolutions were passed for the issuance of $2,000,000 of 7 per cent. debentures under a trust agreement. Both the mortgage or deed of trust securing the first mortgage bonds and the trust agreement providing for the issuance of debentures were duly executed and recorded.

█ 1. Under this finding of facts, I think the conclusion is inescapable that the debtor, as the law of Delaware, under which it was organized, stood at that time (1927–1928), was legally organized and was empowered to function as a corporation. See vol. 35, c. 85, § 4, p. 223, Laws of Delaware.

█ (a) As to the action of the directors on February 9, 1928, the record shows that on December 21, 1927, when the first board met and organized, a set of by-laws was adopted which provided for the filling of vacancies by the remaining members of the board. There were three duly elected members, and two places on the board of five remained unfilled. At the meeting on February 9th, these two vacancies were filled and three other persons elected in place of the first three, who had tendered their resignations to take effect on the following day, February 10th.

█ (b) Thus the board, which acted in authorizing the contract of lease with the Yazoo & Mississippi Valley Railroad Company on February 11, 1928, the mortgage or deed of trust to secure the bonds, and the trust agreement for the issuance of the debentures on April 3, 1928, was properly constituted to perform those duties. The amount of capital with which a corporation organized under the laws of Delaware at that time (1927–1928) could "commence business" was "not less than $1,000, in the

case of shares with par value, or not less than ten shares in the case of shares without par value.", In the present case the stock had no par value and 10 shares were actually subscribed by the three persons organizing the corporation. There was no express statutory requirement in Delaware at that time that subscriptions to stock had to be paid in before the corporate entity came into existence or could perform its functions, and, in the absence of such requirements, acts done before actual payment were not for that reason invalid. See Fletcher, Cyc. Corporations, vol. 2, pp. 405, 406. However, as herein previously stated, I believe the evidence clearly preponderates in favor of the funds (both for the 10 shares of the original subscribers and the 190 additional shares subscribed for by Shinners), $1,000 having been paid in before the railroad contract was entered into, although actual entry of it on the books of the debtor was not made until the day the resolution authorizing the bond mortgage, etc., were passed, to wit, April 3, 1928. This is shown, not only by the positive testimony of Harold Beacom, the attorney who handled the proceedings for organizing the corporation and corroborated by Shinners, according to the best of his recollection, but by the duplicate receipt in the record from the secretary of state of Delaware, showing payment to the state of franchise fees, etc. in the sum of $215.-50.

■ It is not pretended that the original incorporators ever paid anything to the corporation, but is conceded that whatever sums were credited to the debtor for stock was furnished by or caused to be paid by Shinners. Granting that the money had not been actually paid in before the railroad lease was executed, it would appear that the only persons who could complain would be the debtor or the railroad company. It cannot be contended with any reason that the attempt to execute this contract had the effect of paralyzing any further effort at completion of the corporate organization, which as I have found above, had undoubtedly been done as of April 3, 1928, for it is not denied that the $1,000 was in the Treasury of the debtor at that time. See Finch v. Warrior Cement Corp., Steuerwald v. Warrior Cement Corp., 16 Del.Ch. 44, 141 A. 54; Speakman v. Bernstein, 5 Cir., 59 F.2d 520; Wells Company v. Gastonia Cotton Mfg. Co., 198 U.S. 177, 25 S.Ct. 640, 49 L.Ed. 1003. In any event, I think it conclusively shown that there was a bona fide attempt on the part of all concerned to form a valid corporation for the purposes declared in its charter and that every one connected with or dealing with it acted in good faith; that they and it have received the benefits of those efforts, and the worst that can be said is that it was a de facto corporation, so that those dealing with it as such are as fully protected as if it had been a corporation de jure. Hackensack Water Co. v. De Kay, 36 N.J.Eq. 548; Mayor of Wilmington v. Addicks, Del.Ch., 47 A. 366; Id., 7 Del.Ch. 56, 8 Del.Ch. 310, 43 A. 297; Helvering v. Wardman, 62 App. D.C. 371, 68 F.2d 418; Oliver v. Home Service Ice Co., La.App., 161 So. 766.

■ 2. Interveners, in the second ground of their attack upon the bonds above stated, say that the purchasers of all of the securities of the debtor, including bonds, debentures, and stock, were chargeable with notice and knowledge, not only of the illegalities and infirmities of the organization proceedings, but all other matters affecting the legality and validity of the bond mortgage and lien attempted to be given to this class of securities, and that the present holders have and can assert no better right than these original purchasers.

Some of the things, in addition to the invalidity of the corporate organization, claimed by the interveners to have made the lien and mortgage securing the bonds ineffective, are: That at the meeting of stockholders and directors of the debtor on April 3, 1928, at which the proposal of Byllesby & Co. and Federal Securities Corporation to purchase $5,000,000 of first mortgage bonds, $2,000,000 of debentures, and the entire issue of 60,000 shares of the common stock of the debtor was made and accepted, the board of directors was composed of Philip R. Clarke, Joseph Briggs, William G. Pohl, John J. Shinners and Harry E. Bovay; that Bovay, president of the debtor, although refraining from participating in this action at said meeting, which interveners claim was never held, was reported at said meetings as stating he had been authorized by the said two banking houses to submit the proposal, and the other named four acted as directors in accepting the same; that Clarke was president of the Federal Securities Corporation, Briggs was vice-president, and Pohl assistant treasurer, of Byllesby & Co., Shinners was the latter's employee, and shortly thereafter became vice-president; that these circum-

stances gave the proposed purchasers, through said officers and employees, control of the debtor and placed them in the position of dealing with themselves; that for the said securities the debtor received the sum of $6,300,000, which was credited upon its books as follows:

| | |
|---|---|
| Capital Stock | $1,000 |
| Price of Bonds | $4,500,000 |
| Price of debentures | $1,799,000 |
| Total | $6,300,000 |

showing a discount of $500,000 on the bonds and $201,000 on the debentures; that, in connection with the marketing of said securities, the said purchasers and the debtor "published and distributed among the prospective purchasers of the said debentures, a circular or prospectus, in which it was represented and held out to prospective purchasers that Coverdale and Colpits, consulting engineers, had completed a detailed study of anticipated income from railway traffic"; that they, the said banking houses, conservatively estimated during the first ten years of the life of said bridge there would be an average of approximately 200,000 railroad cars per year hauled across said bridge; and that their estimate was based upon the report of said engineers, whereas, over a period of twenty-five years prior thereto the average had been about seventy cars per year—a fact withheld from said circular; that the estimate of said engineers was based upon certain possible diversions of traffic, none of which were set forth or revealed in said prospectus, and which said representations were misleading and fraudulent; that the purchasers "of said debentures relied upon the truth and accuracy of said prospectus; and had they known that the actual cost of constructing said bridge would be less than $5,000,000 and said representations were untrue, they would not have purchased said securities." For all of these reasons, it is contended the debenture agreement "is null and void and not binding, in any respect, upon the debenture holders."

All of the bonds and debentures were sold to the public approximately at par by the purchasing banks within less than two days after they were delivered and the purchase price paid to the debtor. These funds, that is, the proceeds of both classes of securities, were used in building the bridge, paying interest on the bonds and debentures during the period of construction of about two years, and are accounted for on the books of the bridge company, although there is a controversy about $100,000 paid to Harry E. Bovay as the result of a change in the stock set-up between him and the purchasing banks with respect to the controlling stock of the corporation and as to which no opinion is expressed at this time.

Whatever may be said as to the rights of the corporation, its stockholders and creditors against Byllesby & Co. and the Federal Securities Corporation in the handling of the affairs of the debtor during its formation and subsequent operations, including the relations to the purchasers of the directors who acted in these transactions, the commissions charged, etc., I think it clear that both bondholders and debenture holders made their purchases in good faith and in the belief that the papers, contracts, and proceedings under which they were issued were what they purported to be, and that they should participate in its earnings or its property, in case of default and liquidation, in the manner and to the extent the mortgage or deed of trust and debenture trust agreement set forth that they should. If there were illegalities or informalities in the execution of these contracts, or misrepresentations in the sales, which induced the debenture holders to make their investment, the same conditions and misrepresentations were likewise made to and acted upon by the purchasers of the bonds, and the former is in no better position to take advantage of them than the latter would be. There is no contention that any of the present holders of either class had any knowledge of the alleged informalities, and my view is that their relative positions cannot be disturbed on these grounds. See Guidry on Bonds & Bondholders, c. 5, §§ 152, 164, 165; Louisville, New Albany & Chicago Railroad Company v. Louisville Trust Company, 174 U.S. 552, 19 S.Ct. 817, 43 L.Ed. 1081; Dickerman v. Northern Trust Company, 176 U.S. 181, 20 S.Ct. 311, 44 L.Ed. 423; Murray v. Lardner, 2 Wall. 110, 17 L. Ed. 857; Smith v. Sac County, 11 Wall. 139, 20 L.Ed. 102.

3. The interveners contend that the land upon which the eastern end of the bridge rests on the Mississippi side is not covered by the mortgage, for the reason it was not owned at the time the mortgage was executed, but in the brief of their counsel I find this admission: "We, therefore, ask the Court to permit this to be done, should the Court not consider our pleadings

amended and extended by the evidence. It appears that the Cora M. Houston property was acquired by the bridge company on March 30, 1928 and that on the execution of the deed of March 30, 1928 the title to this property vested in the bridge company. The deed was acknowledged in the City of Memphis March 31, 1928 and was duly recorded in Deed Book 172, page 294, in the office of the Clerk of the Chancery Court of Warren County, Miss. However, it was discovered that this 1.869 acres on which the bridge to be built was to stand was not specifically described in the mortgage and which mortgage was signed and acknowledged by John J. Shinners, Vice-President, and Wm. G. Pohl, Secretary, for Vicksburg Bridge & Terminal Co. on April 5, 1928 and before the Notary Public and Secretary of the Continental Bank & Trust Co., as Trustee, on April 10, 1928, and by Thomas W. Mc Coy, co-trustee, on April 6, 1928. No authority was ever granted to the officers to execute such an instrument, save such as might result from the resolutions appearing on the minutes of the company, reciting a directors' meeting on April 3, 1928, and which minutes have been established to be false and untrue."

Section 7 of the Act of Congress, Pub. No. 170, 69th Congress, 44 Stat. 390, which granted the franchise or permit to the Arkansas corporation, assignor of the debtor, to build the bridge, provides: "The right to sell, assign, transfer, and mortgage all the rights, powers, and privileges conferred by this Act is hereby granted to the said Vicksburg Bridge and Terminal Company, its successors or assigns, and any corporation, to which such rights, powers, and privileges may be sold, assigned, or transferred, or which shall acquire the same by mortgage foreclosure or otherwise, is hereby authorized and empowered to exercise the same as fully as though conferred herein directly upon such corporation." From which it will be seen the consent of Congress, in so far as that consent was necessary, was given to mortgage the bridge, its accessories, lands, franchise, income, etc. Thereafter the plan for the location of the bridge, its piers, abutments, etc., in the river and on its banks, in both Louisiana and Mississippi, were submitted to and approved by the War Department, as required by the acts of Congress. The land on which the east end rests was acquired from Mrs. Cora M. Houston on March 30, 1928, and was recorded in Deed Book 172, page 294, of the

chancery clerk of Warren county, Miss. The mortgage was executed by the debtor on April 7, 1928, and acknowledged by the mortgage trustees on April 6 and 10, 1928, respectively. Subsequently a new deed to the property from Mrs. Houston was executed on April 7, 1928, and recorded in Book 172, page 346. The property mortgaged or conveyed under the trust deed was described generally as follows: "The following property (which collectively is hereinafter sometimes called the 'Trust Estate'), to-wit: The real property, estates, easements, franchises, privileges, grants, rights, immunities, powers, buildings, fixtures, structures, erections and rights therein and thereto, forming a part of or appertaining to, or used, occupied, or enjoyed in connection with that certain combined highway and railroad bridge (hereinafter called the 'Bridge') traversing the Mississippi River from a point on the east bank thereof at or near the City of Vicksburg, in the State of Mississippi, to a point opposite thereto on the west bank of said river at or near the Village of Delta Point, in the State of Louisiana, and said bridge structure so situated, *and the easterly and westerly approaches* to said Bridge, whether any of said properties, estates or interests are owned by the Company at the date of the execution of this mortgage or thereafter acquired, and including *but not limited to* the following, viz. * * *" (Italics by the writer of this opinion.)

It then describes specifically parcels of land in both Mississippi and Louisiana, but the Houston tract is not so described. However, it seems clear from the description above, as well as the fact that there was obtained from the vendor, Mrs. Houston, a subsequent deed to the same property, that it was the intention to include in the mortgage all the property embracing any part of the bridge structure, including the land upon which it rested or which constituted any part of its approaches, and other necessary appurtenances, either as presently owned and described or as subsequently acquired property. See Warner v. Grayson, 200 U.S. 257, 26 S.Ct. 240, 50 L.Ed. 470. The specific descriptions used were expressly declared not to limit the extent of the property conveyed, but there was to be included everything necessary for a proper use of the bridge, and, as elsewhere stated, the Houston tract was absolutely necessary to that purpose. It does not stand the test of reason to say

that either the trustees or the mortgagor contemplated that the mortgage should embrace the concrete and steel of the structure, when erected, but not the land upon which it rested, but the generality of the terms of the mortgage clearly indicate that the purpose was to mortgage the bridge as a complete entity, including all of its accessories and necessary appurtenances, such as the approaches and abutments for which this particular tract was purchased. Central Trust Company v. Kneeland, 138 U.S. 414, 11 S.Ct. 357, 34 L.Ed. 1014. The intention of the parties is the controlling consideration in the interpretation of the mortgage. C.J. vol. 41, p. 449, § 335, verbo "Mortgage." In Smith v. McCullough, 104 U.S. 25, 27, 26 L.Ed. 637, the Supreme Court of the United States had under consideration the question of whether a mortgage upon railroad property, embracing such things as the right of way, roadbed, operating equipment, etc., under a general clause of "present and in future to be acquired property of, or in any manner pertaining to" the railroad, included bonds which had been issued by a county to aid in construction of the road. It decided that they were not, for reasons given, but in laying down the guide by which this should be determined, 104 U.S. 25, at page 26, 26 L.Ed. 637, said:

"Waiving any inquiry as to whether such property as that in question could have been conveyed by mortgage in any other way than by estoppel against the mortgagor, we will consider whether the bonds issued by Sullivan County are embraced, or were *intended to be embraced,* by the mortgage to the Farmers' Loan and Trust Company. That question is within a very narrow compass. *It must be solved so as to give effect to the intention of the parties,* to be collected as well from the words of the instrument as from the circumstances attending its execution." (Italics by the writer of this opinion.)

See, also, C.J. vol. 41, p. 475, § 391, verbo "Mortgages."

█ In any event, the trust agreement under which the debentures were issued specifically recognized the superior right of the bonds as a lien upon the entire structure, and the present interveners, as the holders of this inferior class of obligations, are scarcely in position to question that fact.

4. Interveners' counsel have argued at great length the proposition that the franchise of the bridge company could not be mortgaged. The brief particularizes this contention and asserts that the mortgage was invalid, for the following reasons:

"(a) As to the attempted conveyance and mortgage of the secondary franchise, being Public Act No. 170 of 69th Congress, H.R. 9758.

"(b) As to the attempted conveyance and mortgage of the income and future earnings of the corporation.

"(c) That the said alleged first mortgage is subordinate to the claims of debenture holders and other creditors as respects said franchise and said income and future earnings."

It relies upon a provision of the Mississippi Code 1930, reading: "4155. *Mortgage or deed of trust subordinate to certain claims.*—A mortgage or deed of trust conveying the franchise or income or future earnings of any corporation, no matter when or how such corporation was created, shall not be valid against debts contracted in carrying on the business of the corporation."

█ As heretofore pointed out, the Act of Congress, Pub.No. 170, 69th Congress, granting the permit or authority to construct the bridge in question, gives expressly the right to "mortgage all the rights, powers, and privileges conferred by this Act * * * and any corporation to which such rights, powers, and privileges may be sold, assigned, or transferred, or which shall acquire the same by mortgage foreclosure * * * is hereby authorized and empowered to exercise the same as though conferred herein directly upon such corporation." Section 7. Among the privileges granted by the act was the right "to fix and charge tolls for transit over such bridge." Section 3. The act of mortgage, in subdivisions VI and VII, describes as a part of the property pledged or encumbered to secure the bonds, as follows:

"All right, title and interest of the Company in and to a certain franchise or license given and granted to the Vicksburg Bridge and Terminal Company, an Arkansas corporation, by an Act of the Congress of the United States of America, approved May 3, 1926, entitled 'An Act granting the consent of Congress to the Vicksburg Bridge and Terminal Company to construct, maintain, and operate a bridge across the Mississippi River at or near the City of Vicksburg, Mississippi', and duly and

regularly assigned by said Vicksburg Bridge and Terminal Company, an Arkansas corporation, to the Company."

"All corporate and other franchises, grants, rights, privileges, immunities or interests, whatsoever heretofore or hereafter granted to the Company by the United States of America, the City of Vicksburg, Mississippi, or the County of Warren, Mississippi, or the State of Mississippi, or the Village of ·Delta Point, Louisiana, or the Parish of Madison, Louisiana, or by the State of Louisiana, or by any political subdivision, board, body, or official of any or either of them."

The section of the Mississippi law relied upon, section 4155, does not·purport to prohibit the mortgaging of the secondary franchise or the right of the corporation to collect tolls, or its future income, as distinguished from the primary franchise of being a corporation and exercising corporate functions. It merely says that it "shall not be valid against debts contracted in carrying ·on the business of the corporation." In First Union Trust & Savings Bank v. Mississippi Power Company et al., 167 Miss. 876, 150 So. 381, 383, the Supreme Court of Mississippi, in dealing with the claims of a power and telephone company for services during the operation of ·a hotel, held that, in so far as these creditors were concerned, a mortgage of future earnings and income was invalid, but otherwise said: "The invalid part of the mortgage is simply ignored, it amounts to nothing; but the valid part stands as against all unsecured creditors of every kind and character; and the ·mortgage is good on the franchise and future earnings and income as to all such creditors, except those whose claims were contracted in carrying on the business of the corporation."

See, also, Gulf Refining Company v. Cleveland Trust Co., Miss., 108 So. 158.

As contended by counsel, we are bound by this construction of the Mississippi statute, so that it would seem the only question to be determined in the present case is as to whether the claims of the interveners fall within the category of having been contracted "in carrying on the business." Ordinarily, this expression includes claims for material, labor, services, etc., used, performed, and rendered to a going concern, or arising in the way of liabilities for torts, etc., committed in connection therewith. In the case before us, the claims of the interveners are based upon the purchase of negotiable securities ·in the raising of capital to build the bridge, and came into existence even before the construction was commenced. They are supported by a trust agreement, the very terms of which declare that they are to be paid after the principal and interest of the bonds and the discharge of operating expenses— in other words, out of net revenue, and I think clearly do not fall within the contemplation of the statute as having been incurred "in carrying on the business."

5. It is contended that, in so far as that part of the bridge which is in Louisiana is concerned, it could not be mortgaged for the reasons,

(a) The title to the land or bed ·of the stream upon which it rests is in the state of Louisiana; (b) the state did not consent to its use; and (c) the mortgage does not comply with the law of the state as to chattels or property apart from the soil upon which it is constructed.

It is true that the bed of a navigable stream in Louisiana is the property of the state by virtue of its sovereignty, and that under the Constitution, article 4, § 2, it cannot be sold or alienated so as to vest the fee in another. However, the Legislature, within the limitations of the Constitution, and except as . restricted thereby, has the power to deal with this situation and the state's property for the benefit and convenience of its citizens, as it may see fit. Conceding for the moment that the law of the state is controlling, notwithstanding Congress in granting the permit to build the bridge also authorized the mortgaging of the physical structure, revenues, and future income, etc., we find that the Legislature in 1908, by Act No. 50 of that year, provided that "Bridge company or bridge and railroad company, * * * established under ·the laws of this State, * * * may borrow from time to time, such sums of money as may be required for construction, repairs or acquisition of property, or franchises, and for this purpose may issue bonds or other obligations, secured by mortgage or pledge as the case may be of the franchises and all the property, real, and personal, and incomes, revenues, contributions and receipts of said companies * *. * with power to sell, pledge, or otherwise dispose of said bonds."

Any question as to the right of a foreign corporation, such as the debtor

(created under the laws of Delaware), to exercise said privileges, was removed by the Act No. 120 of 1920, which expressly declares that it may "exercise the same powers, rights and privileges as are accorded to similar domestic corporations * * * upon filing in the office of the Secretary of State a certified copy of its certificate of incorporation," and designating an agent to represent it in this state for service of process, etc. Interveners concede that the debtor qualified to do business in both the states of Louisiana and Mississippi "shortly subsequent to its incorporation." However, they insist that this authority was necessarily subject to the limitations of the state laws otherwise as to mortgages. It is true that under the old codal provisions of Louisiana there was a clear distinction between mortgages or similar contracts affecting immovable or real property and watercraft, and those covering the pledging or encumbering of movable or personal property. We had no chattel mortgage law until within the past twenty-five years, and the only way such property could be encumbered prior thereto was by delivery in pawn or pledge. But the necessities of modern business have caused the Legislature to meet the situation as it arose, and acts, such as No. 50 of 1908, I think were intended to accomplish definite purposes as clearly expressed in their provisions. It must be assumed that the Legislature knew the state owned the fee of the beds of the many navigable streams of the state, hundreds of miles in length, running in some instances from its northern to its southern boundaries, and that in constructing bridges across them it would be necessary to occupy state property. Hence in reason it cannot be said that it was intended to authorize the issuance of bonds, in so far as bridges were concerned, having a security based solely upon so much of the structure as rested upon private property owned by the mortgagor on either side. Ordinarily, the major part of such a structure, where the stream is wholly within the state, rests upon property affected with this sovereign title, and to say that the lawmaker intended such an impossible situation is to charge him with doing a foolish thing. My view is that this title in the state is in the nature of a trust for the whole people, and the Legislature may itself utilize it or authorize its use in a manner beneficial to its citizens, so long as that sovereignty is not given up or seriously impaired. It requires no argument to show, in modern times, the advantages to the whole people of highways and bridges; but whether this statute is construed as an express consent of the state, in every instance of a navigable stream, to go upon and occupy the property of the state or not, it clearly authorizes the mortgaging of whatever is put there, and I am of the view that no one but the state, through its proper officers, can be heard to question its consent to a particular location. See Oliff v. City of Shreveport, 52 La.Ann. 1203, 27 So. 688.

The conclusion thus reached makes it unnecessary to go into the question of the paramount authority of the federal government, as I believe, even under the law of Louisiana, the mortgage, both as to the physical property, the revenues and income, was valid. It also obviates the necessity of discussing the matter of whether the state, if it saw fit, might assert any interest in the bridge, because constructed on soil, the fee of which is vested in it. No one will dispute, I believe, that the Legislature has the power to declare what can be mortgaged, whether real, personal, or intangible property, and, as to bridges, it has provided that all species may be included. Therefore, the statute must supersede earlier provisions and jurisprudence having a contrary tendency. My view is that all kinds of property could properly be covered in a single mortgage or deed of trust, and it was not necessary to execute a separate act for chattels or intangibles. See Security Bank v. Tangipahoa Parish News, 173 La. 716, 138 So. 519.

6. The conclusions reached with respect to the five preceding attacks of the interveners upon the mortgage and lien of the bonds effectively answer the point raised by No. 6.

In addition to the legislative authority for constructing bridges and executing mortgages to secure bonds issued to build them, the people of the state, by constitutional amendment, article 10, § 4, as amended, specially exempted from taxation for a period of years the property of any one who would build a bridge across the Mississippi river. It has also recognized the title of the debtor in this property through administrative agents, by assessing and collecting taxes thereon. Hence it

does not lie in the mouths of these interveners, who took their debentures under a trust agreement which specially subordinated them to the first mortgage bonds, to champion the interest of the state in attacking them. Interveners' position that provisions of law must be complied with to sustain a statutory lien I think is fully met by the references above made and the conclusions announced.

The demands of the interveners will be rejected and the first lien of the bonds under the mortgage and· deed of trust, superior to that of debentures, will be sustained.

Proper decree should be presented.

## On the Issue of Solvency.

 Under the various plans of reorganization proposed in this proceeding, all of the stock was excluded from participation. Certain of the stockholders have claimed the right to share in the plan. It therefore became necessary for the court to determine whether the debtor was solvent.

A special master was appointed to hear the evidence and make report of his findings of fact and conclusions of law upon the question of solvency, along with other issues. The court also named two engineers of standing, one who had been a member of the firm who drew the plans and specifications and served the debtor during the construction of the bridge, and the other, wholly independent in so far as any prior connection with this enterprise was concerned, but who had for several years been with the Railroad Commission of Texas, and who were directed to make an appraisal of the debtor's assets, principally the bridge. They were instructed to take into consideration all appropriate elements and circumstances, and to furnish the court with detailed reports showing their best opinions and estimates of values to be considered on the issue of solvency. This they did, and some two weeks were spent by the master in hearing evidence, including that of the engineers and many other persons, but, in view of the comparatively short time left after completing the hearing, he made only a partial and incomplete report. Therefore, on the day which had previously been set to consider this, as well as other matters which had been referred to the master, the court determined to treat proceedings before him in the light of a commission to take evidence, and to itself take over and decide the questions of fact and law involved in those references.

## Findings of Fact.

When organized in 1927, the 'authorized issue of capital stock of the Vicksburg Bridge & Terminal Company was fixed at 60,000 shares of no par value. Subsequently, $1,000 was paid into the treasury as required for the commencement of business, the directors fixed an arbitrary value of $5 per share for the stock, and 200 shares were issued in satisfaction of the cash thus subscribed. Thereafter, the entire remaining authorized and unissued stock of 59,800 shares, together with $5,000,000 of first mortgage bonds, and $2,000,000 of debentures, the latter unsecured except for the pledge of net earnings after payment of operating and maintenance expenses, interest, and sinking fund requirements, were sold to H. M. Byllesby & Co. and Federal Securities Corporation (hereinafter, called the Investment Banks), investment bankers of Chicago, for the sum of $6,199,000, cash. Within forty-eight hours after delivery of the securities, the bonds and debentures were sold to the public at approximately their face or par value of $7,000,000, and the difference of approximately $800,000, and the stock were received by the Investment Banks, as commissions and expenses, and charged to the corporation as costs of financing. The net proceeds of $6,200,000, representing the original subscription of $1,000 and the $6,199 paid by the Investment Bankers, were made available for construction of the bridge. During the period of construction these funds earned, and there was credited to the company as interest on bank balances, the sum of $243,947.72, thus providing a total sum of $6,443,947.72, to be used for covering the cost of construction and to pay interest on the bonds and debentures until the bridge opened for traffic on May 1, 1930.

The engineers found from the company's records, and as to which there seems no dispute (which figures are accepted by the court) that when the bridge opened for traffic on May 1, 1930, there had been invested a total of $7,084,236.12, represented as follows:

Construction engineering, etc............ $4,979,833.57
Real Estate and rights of way........... 40,494.92
All other costs and expenses............. 2,063,927.63

Total ................................. $7,084,256.12

"All other costs" were made up as follows:

| | |
|---|---:|
| Preliminary costs and traffic surveys.... $ | 15,584.31 |
| Legal Costs | 72,701.73 |
| Administrative Costs | 94,927.29 |
| Franchise | 123,666.00 |
| Bond Printing, filing, etc. | 31,126.65 |
| Other miscellaneous costs | 71,920.40 |
| Interest during construction | 954,001.25 |
| Discount on bonds and debentures | 700,000.00 |
| | $2,063,927.63 |

Since receivers were appointed by this court on January 30, 1934, capital expenditures have been made as follows:

| | |
|---|---:|
| West Approach Viaduct Extension | $275,048.97 |
| East Bank Drainage Facilities | 17,849.96 |
| East Bank Pedestals | 44,022.67 |
| Added pavement and miscellaneous | 1,312.26 |
| | $338,233.81 |

Adding the sum of these figures to the capital investment, at the date of the completion of the bridge, makes a total of $7,-422,489.93, from which the engineers have deducted the cost of the wooden trestle (some 1,100 feet in length at the west end of the bridge) replaced during the pendency of these proceedings by concrete and steel, to wit, $101,439.23, leaving, according to these figures, as of March 1, 1937, a net total investment of $7,321,050.70. Based upon the cost of material and labor as of the same date, March 1, 1937, they have found that the same factors would produce or require an investment of:

| | |
|---|---:|
| Construction, engineering, etc. | $5,753,053 |
| Real estate and right of way | 40,500 |
| All other costs (as before) | 2,064,000 |
| Total | $7,839,553 |

They have applied 1⅓ per cent. depreciation, used throughout the report and found, on the basis of reproduction new, less depreciation, an investment as of the said date of $7,153,000.

Actual revenues of the property have been as follows:

| Fiscal year | Highway | Railway | Total |
|---|---|---|---|
| 1930 (11 mos.) | $145,755 | $268,590 | $414,345 |
| 1931 | 167,177 | 265,062 | 432,239 |
| 1932 | 128,659 | 172,989 | 301,648 |
| 1933 | 140,078 | 194,211 | 334,289 |
| 1934 | 144,267 | 207,196 | 351,463 |
| 1935 | 166,041 | 208,720 | 374,761 |
| 1936 | 217,349 | 253,321 | 470,670 |

At the time the report of the engineers was written, one month (March) of the fiscal year 1936 had not expired, but was estimated, making the figures of that year $452,000, whereas the actual results as shown above were $470,670.78. This estimate for the whole of 1936 gave them an annual average gross income of $391,000, which, of course, will be increased by the excess of the last month of the fiscal year of 1936 over the estimate of the engineers.

The engineers reviewed the prior history of railroad traffic across the Mississippi at Vicksburg, which I shall not discuss other than to say it is approved and adopted as a matter of fact. They also considered Barrons Record of Business (January 4, 1937) "and similar analyses" showing "depressions of more or less severity at intervals of eleven years or less, e. g., 1878, 1885, 1893, 1897, 1908, 1914, 1921, 1932, 1933, 1934, * * *" and from which they concluded that "unbroken prosperity until 1950 (the date when the bridge under the Act of Congress is subject to being taken over by the States of Louisiana and Mississippi, or either of them or their subdivisions) would be contrary to the past average experience." They made a chart showing the number of railroad cars crossing the river each year from 1904 to the end of the fiscal year 1936 "and also certain assumptions for the number * * * which may cross * * * during the next thirteen and one-twelfth fiscal years, ending April 30, 1950." From which they estimated that during this remaining period the annual average crossings will be approximately 105,000 cars. Applying $2.75 a car under the lease, they obtained a figure of total revenues from the railroad side alone of $3,848,600.

The engineers have likewise prepared a chart, showing "by count the actual income of the bridge for the years 1930 to the fiscal year 1936, inclusive, and certain assumptions of similar traffic earnings, for the next 13¹⁄₁₂ years ending April 30, 1950." They have also made certain assumptions with respect to revenue arising from rentals received from telephone companies using the bridge for their lines, which was inaugurated under a contract made with one particular company in 1936. Comparisons were made of the actual experience of bridges at Omaha, Neb., Sandusky, Ohio, and the Holland Tunnel under the Hudson river in New York, for the years 1930 to 1935, inclusive, and it was found that "the variations of income * * * have gen-

eral similarity to the variations and highway traffic income of the Vicksburg Bridge." Attention is also called to the fact that these variations "have a general correspondence to the general business conditions shown by the business activity graph. * * *" Consideration was given to the Texas Exposition at Dallas as having some bearing upon the "marked" increase of highway traffic during the fiscal year of 1936 over 1935, and, while it cannot be anticipated that the "same marked increase" will occur in succeeding years, it is believed that "general conditions justify the assumption that there will not be a recession below 1936, but a modest increase above it, continuing over succeeding years."

The report further recites:

"Such increased highway traffic should result not only from general improved business conditions but also from the extensive State Highway pavement program projected and now under construction in the State of Mississippi. This very extensive State program will certainly result in a marked increase in automobile traffic in the State together with an increase in ownership of automobiles in the State. It is well established that increased traffic comes with the increased extent of improved highways, and also that with improved general business conditions there is freer and more extensive use of motor vehicles.

"These improved highways across Mississippi also will complete a through east-west highway in the general latitude of this bridge, making possible through traffic across the United States and to Mexico on all-improved hard surface highway. There is also a definite trend towards increase of truck hauling, of bus travel and of trailer movement for personal and for business service all over the country. All of these factors will contribute to increased highway traffic across the bridge and we believe justify the average anticipations shown for the ten year period.

"It is possible that the increased use of busses and trucks may have a tendency to reduce the number of railroad cars operating across the bridge; thus the graphs developed for future railway traffic and for future highway traffic may not bear the same relation to each other which we have shown. That is, the highway earnings of the bridge may be increased at the expense of the railway earnings, but with the rates now obtained the bridge will profit more per ton by traffic in trucks than in cars. In spite of such possible variations we believe the total combined earnings of these traffics as shown on Chart C should be reasonably secured."

It is then pointed out that, beginning with 1937, the revenue from rentals paid for telephone wires will be $3,000 per year, and estimated that this will increase at the rate of $500 per year for the ensuing 13½/₁₂ years.

Accordingly, a chart for highway and telephone line income is predicted as follows:

| Fiscal Year | Highway Traffic | Telephone | Total |
|---|---|---|---|
| 1937 | $ 225,000 | $ 3,000 | $ 228,000 |
| 1938 | 231,000 | 3,500 | 234,500 |
| 1939 | 237,000 | 4,000 | 241,000 |
| 1940 | 243,000 | 4,500 | 247,500 |
| 1941 | 249,000 | 5,000 | 254,000 |
| 1942 | 255,000 | 5,500 | 260,500 |
| 1943 | 261,000 | 6,000 | 267,000 |
| 1944 | 267,000 | 6,500 | 273,500 |
| 1945 | 273,000 | 7,000 | 280,000 |
| 1946 | 279,000 | 7,000 | 286,000 |
| 1947 | 285,000 | 7,000 | 292,000 |
| 1948 | 291,000 | 7,000 | 298,000 |
| 1949 (13 months) | 319,400 | 7,600 | 327,000 |
| | $3,415,400 | $73,600 | $3,489,000 |

The gross estimated income from both kinds of traffic is fixed at $3,848,600, for railroad, and $3,489,000 for highway and telephone, respectively, making a grand total of estimated revenues for the 13½/₁₂ years of $7,337,600. Out of this it is calculated there will have to be paid an average annual cost of "operation and maintenance" of $103,000, details of which are set forth in the report and not necessary to repeat here. The engineers have calculated on the basis of these estimated revenues, after deducting operating and maintenance costs, there will remain a net income over the period of $5,990,000, of which $3,935,000 will be required to meet interest of 6 per cent. on $5,000,000 of first mortgage bonds and leaving a net amount for sinking fund purposes of $2,065,000, which will be further reduced by income taxes to the amount of $1,753,250. To the latter figure they add accruing interest upon the sinking fund of $142,000, thus bringing the estimated available cash for meeting principal of the bonds up to the sum of $1,897,250.

The Secretary of War, under provisions of the statute granting the franchise or

permit to build the bridge, has fixed the value, for purposes of exercising the recapture privileges by the States or their subdivisions, at $6,200,000, to which the engineers thought there should be added for "later betterments and improvements" approximately $60,000, making a grand total of $6,260,000. Applying to this figure the 1⅓ per cent. annual depreciation, they arrive at a value of $4,520,000 as the price which would have to be paid by the States to the bridge company. Adding this latter figure to the cash available in the sinking fund, as above of $1,897,250, makes $6,417,-000 for distribution to the company or its creditors. A variation of as much as $400,-000 in the purchase price of the bridge might increase or decrease these figures, in which event the amount for distribution would likewise increase or be reduced.

Therefore, after taking into consideration all elements and factors, the engineers conclude that a valuation "ranging from $5½ Millions up to $6 Million could be liquidated," or represents the present value to the company or its creditors in view of the recapture clause in favor of the States.

As previously stated, some two weeks were spent in submitting evidence, much of which was irrelevant, but my view is, generally speaking, the opinions and estimates of the engineers are more reliable. Hence I adopt their conclusions as to the various elements to be considered, the findings of fact as disclosed by the company's records, as well as the view that the bridge will undoubtedly be taken over by the States, one or both, or their subdivisions, not later than April 30, 1950, and that calculations should be made accordingly. I am of the view that the possibilities with reference to road improvements, business cycles, etc., were duly considered. However, the revenues of the debtor for the months of March to October, 1937, have exceeded considerably the estimates of the engineers. The figures are as follows:

| 1937 | Highway | Railway | Totals |
|---|---|---|---|
| Mar. | $17,380.55 | $25,261.50 | $ 42,642.05 |
| Apr. | 16,602.95 | 20,292.25 | 36,895.20 |
| May | 19,520.30 | 20,875.25 | 40,395.55 |
| June | 21,926.05 | 19,580.00 | 41,506.05 |
| July | 26,734.85 | 19,701.00 | 46,435.85 |
| Aug. | 27,933.45 | 20,603.00 | 48,536.45 |
| Sept. | 24,446.85 | 22,445.50 | 46,892.35 |
| Oct. | 21,241.80 | 21,122.75 | 42,364.55 |
| | Total for eight months | | $345,668.05 |

This was a monthly average for the first eight months of the fiscal year of 1937 of $43,208.50. Figures for the corresponding months, that is March to October, inclusive, of 1936, are as follows:

| 1936 | Highway | Railway | Totals |
|---|---|---|---|
| Mar. | $14,323.20 | $18,730.25 | $ 33,053.45 |
| Apr. | 13,844.70 | 17,864.00 | 31,708.70 |
| May | 15,934.25 | 20,924.75 | 36,859.00 |
| June | 17,443.43 | 19,929.25 | 37,372.68 |
| July | 22,746.50 | 21,375.75 | 44,122.25 |
| Aug. | 24,645.60 | 19,016.25 | 43,661.85 |
| Sept. | 20,067.00 | 20,421.50 | 40,488.50 |
| Oct. | 19,240.00 | 24,015.75 | 43,255.75 |
| | Totals for eight months | | $310,522.18 |

This was a monthly average of $38,815.-28.

The total increase of the first eight months of 1937 over the corresponding period of 1936 was, therefore, $35,145.87, or at the rate of $4,393.28 per month; whereas, the estimate of the engineers for the whole fiscal year 1937 of $486,500.-00 as against $470,670.78 (actual highway and railway revenues for 1936) allowed a total increase of only $15,829.22, or at the rate of $1,319.10 per month.

Highway tolls for the months of November to February, both inclusive, of the fiscal year 1936, were as follows:

| 1936 | Highway | Railway | Totals |
|---|---|---|---|
| Nov. | $17,012.55 | $20,803.75 | $ 37,816.30 |
| Dec. | 19,859.85 | 20,531.50 | 40,391.35 |
| 1937 | | | |
| Jan. | $15,386.50 | $20,149.25 | $ 35,535.75 |
| Feb. | 14,022.90 | 23,028.50 | 37,051.40 |
| Total for last 4 months fiscal year 1936-37 | | | $151,794.80 |

This was an average of $37,555.90 monthly for both highway and railway tolls; whereas, for the first eight months of the fiscal year of 1937, the monthly average was $43,208.50, showing an average increase of $5,652.60, which, if it keeps up to March 1, 1938, will carry the current fiscal year approximately $60,000 ahead of the last, or nearly four times the increase predicted by the engineers. The year 1936 ($470,670) exceeded 1935 by $95,909, or approximately $8,000 per month. However, it is not reasonable to expect that yearly increases are going to continue in proportion to what they have been for the past two years.

The figures above for 1937 do not include the revenue that will be derived from

rentals paid by the telephone company, which has been by contract given the right to use the bridge for its wires. Beginning with the year 1937, this will be at the rate of $3,000 per year, with increases according to the additional wires installed. The engineers estimated this increase would average $500 per year over the 13½₂ years from March 1, 1937, to April 30, 1950.

I am constrained to hold, therefore, in view of the substantial increase over the estimates of the engineers for the period of eight months, from March to October, 1937, inclusive, and because of my belief that insufficient weight has been given to the completion in the near future of the good roads program for the state of Mississippi, together with the fact that approximately 80 per cent. of the highway revenue comes from what has been called "local traffic"—that is, mostly from Mississippi and Louisiana—that an appreciably higher return from that source may reasonably be expected. However, the prophesy of the witness Bovay and the contentions of counsel for stockholders, in my opinion, are entirely too optimistic. We have to confine ourselves, in determining matters of this kind, to reasonable probabilities, as disclosed by experience.

▇▇ Counsel for stockholders argue that the valuation figures of the War Department of $6,200,000 do not include the railroad part of the bridge. This, I think, is clearly refuted by the record, as well as the statute under which the War Department has acted. It is also claimed that the good will or going concern value has not been given consideration. For the purposes of acquiring the property by the States, the act of Congress granting the permit or franchise excludes this element from consideration, and I believe we are justified in confining ourselves to what the bridge may reasonably be expected to produce by April, 1950. It seems reasonably certain that the states of Mississippi and Louisiana, or either of them, or their subdivisions, will take over the bridge at that time, if not sooner.

Exercising, therefore, my best judgment, opinion, or "educated guess," whatever it may be called, I conclude that, in the light of all the circumstances, a fair present value for the purposes of the issue of solvency is the sum of $6,500,000.

I, therefore, find that the value of the bridge and its appurtenances, for the present purposes, as of November 1, 1937, is the sum of $6,500,000.

| | |
|---|---:|
| As of the same date, the other assets, consisting of cash, accounts receivable, material and supplies, prepaid insurance and accrued interest were | $1,027,189.65 |
| Total value of all undisputed assets | $7,527,169.65 |

▇▇ Counsel for stockholders urge that a claim against the Investment Banks of approximately $900,000 for funds of the debtor, alleged to have been wrongfully received as fees or commissions and otherwise, should be considered for its full amount as an asset in determining the question of solvency. However, the nature of this claim is such that I do not believe it can be so treated. The court authorized the trustees to bring suit thereon in the Southern District of Mississippi, and, while it was dismissed for want of personal jurisdiction as to the defendants, both by the district and appellate courts, I do not believe it has such definite or undisputed value as to be considered as an asset. So far, the court has not decided to permit it to be brought again in the jurisdiction where the defendants reside. Hence we are not justified in giving any value to this item in determining solvency. In re Cooper, D.C., 12 F.2d 485; Coyle v. Archibald McNeil & Sons Co., D.C., 284 F. 298; First National Bank of Wilkes Barre v. Wyoming Valley Ice Co., D.C., 136 F. 466; In re Cleveland Discount Co., D.C., 9 F.2d 97.

It is also contended that, because the court permitted the trustees to file a petition to reform or to disclaim the lease with the railway company, a substantial value should be given to a possible increase of tolls to be paid by this lessee. If the railway company decline to accede to whatever the court might find as a proper increase in such tolls, it might return to ferries and revenue from that source be lost entirely, with a consequent claim against the estate for damages. Hence any prospective increase in revenues from that source is likewise too uncertain and speculative to be considered in determining solvency.

I find, therefore, that a just and reasonable balancing of liabilities and assets, as of November 1, 1937, should be as follows:

| | | |
|---|---:|---:|
| First Mortgage Bonds............................................... | $5,000,000 | |
| Interest thereon at 6% from Sept. 1, 1933............................. | 1,200,000 | |
| Interest at 7% on the accrued interest maturing semi-annually according to the mortgage............................. | 172,750 | |
| Total amt. due on 1st Mortgage Bonds as of Nov. 1, 1937............... | | $6,372,750 |
| 20 Yr. Debentures................................................ | $2,000,000 | |
| Int. at 7% from Sept. 1, 1932................................. | 793,333 | |
| Total prin. and int................................................ | | $2,796,333 |
| Liabilities ..................................................... | | $9,166,087 |
| Assets ..................................................... | $7,527,189.65 | $7,527,189.65 |
| Excess of liabilities over assets................................. | | $1,688,693.35 |

In addition, there are a number of claims by the states of Mississippi and Louisiana for franchise and other taxes, a claim for professional services of Engle & Laub in excess of $10,000, and such fees and expenses as the court may eventually allow and approve in favor of committees, their attorneys, and other persons rendering services in this proceeding, as to which the court finds it unnecessary to go into in detail at this time, inasmuch as the indebtedness on the bonds and debentures alone exceed by more than $1,500,000 the assets, consisting of the property and funds of the debtor.

The conclusion is inescapable, therefore, that the debtor is insolvent and there is no equity for stockholders which would entitle them to participate in the reorganization.

Proper decree should be presented.